[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 203 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 204 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 205 
Michael Jeffrey Land, the appellant, was convicted of two counts of capital murder involving the death of Candace Brown. A jury found him guilty of murder during a burglary in the first degree and murder during a kidnapping in the first degree. By a vote of 11 to 1, the jury recommended that he be sentenced to death. The circuit court followed the jury's recommendation and sentenced the appellant to die in the electric chair. The appellant raises 12 issues on this direct appeal of those convictions.
 The Facts
On the evening of May 18, 1992, Candace Brown went to her parents' home to pick up her two-year-old son. Ms. Brown's mother and brother followed her home because her residence had been burglarized five days earlier. After ascertaining that the house was secure, Ms. Brown's family members left about 9:00 p.m.
The following morning, Ms. Brown did not report to work. Her landlord came to the residence to oversee the installation of a fence. He noticed that a window near the rear entry had been broken, that the telephone wires had been cut, and that the driver's side window of Ms. Brown's automobile, which was parked in the driveway, had been shattered. He notified the police at 8:30 a.m.
When officers from the Birmingham Police Department arrived, they found that all the doors to the house were locked, and that a storm window had been removed and several window panes had been cut and stacked by a rear entry to the house. In the dust on one of the panes of glass was what appeared to be a shoe imprint with a distinctive tread design bearing the letters "USA."
The police found a two-year-old child alone and unharmed in the house. They also found a note with the name and telephone number of the appellant and the appellant's mother on a bulletin board in the house. The appellant's mother was a Birmingham police officer. Officers telephoned her and ascertained where the appellant worked.
About 2:00 p.m. on May 19, Detectives Steven B. Corvin and Larry Fowler went to the Riverchase Galleria, where the appellant was repairing the mall roof. Corvin and Fowler told the appellant that they wanted to ask him some questions relating to the disappearance of Candace Brown and the appellant agreed to accompany the detectives to the police station. The appellant was taken to an interrogation room and informed of his rights under Miranda v. Arizona, 384 U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He signed a waiver of rights form and agreed to have his statement tape-recorded.
In a statement beginning at 2:42 p.m., the appellant stated that he knew Candace Brown but that he had not seen her in about a week, had no idea where she was, and had no knowledge about a burglary of her residence on May 18. However, he admitted that he had burglarized her house on May 13, 1992, and that during that burglary he had "cut the phone lines."[1] R. 23. When asked where he had been the night before, the appellant stated that he had visited with his girlfriend, Shelly Wade, until shortly before *Page 206 
midnight. He said that after he left Ms. Wade he fell asleep in his car in the parking lot at Ms. Wade's apartment complex, and that he awoke and left the parking lot at 4:00 a.m. and drove to his grandfather's house. The appellant claimed that he reported to work at the Galleria before 6:00 a.m. on the morning of May 19. The appellant told police that he had had lunch that day with Marie Fortis, who he claimed was another girlfriend, and that his car was at Ms. Fortis's house in Bessemer.
During the course of the interview with the appellant, Detective Fowler noticed what appeared to be bloodstains on the appellant's tennis shoes. After the appellant completed his statement, Fowler asked to see the appellant's shoes. At that point, Fowler noticed that the tread design on the bottom of the shoes appeared to match the imprint on the window glass at Candace Brown's house. In the meantime, Birmingham Police Lt. Carl M. Quinn had telephoned Marie Fortis. Ms. Fortis denied having had lunch with the appellant and stated that his car was not, and had never been, at her house.
After conferring with Detective Fowler and Lt. Quinn, Detective Corvin informed the appellant that his statement was incompatible with the evidence found at the scene of the burglary. The detective also told the appellant that Ms. Fortis had denied having lunch with him or having his car. Corvin told the appellant that he needed to tell the truth about the disappearance of Candace Brown and the burglary of her home.
At that time, the appellant agreed to make a statement but refused to permit it to be tape-recorded. Once again the appellant was informed of and waived his Miranda rights. In his second statement, the appellant claimed that he met two men at a service station on May 19. The appellant identified these men only by the names "Tony" and "Edward." According to the appellant, Tony and Edward asked him if he knew an easy mark for a burglary and the appellant suggested Candace Brown's house. The appellant said that Tony and Edward paid him $20 to cut the window glass of Ms. Brown's residence and that all three of them entered the kitchen.
According to the appellant, Candace Brown appeared in the kitchen and either Tony or Edward slapped her and knocked her to the floor. The appellant told Detective Corvin that Ms. Brown's nose and mouth began to bleed. He said that as Ms. Brown fell down, she grabbed his hand and he may have gotten "some blood on his gloves from that." R. 1010. When Corvin informed the appellant that police evidence technicians had found no trace of blood in Ms. Brown's house, the appellant said that "one of the guys [Tony or Edward] cleaned it up with some paper towels and put [the towels] in his pocket." R. 1010. The appellant said that after Ms. Brown was knocked down he got scared and left the residence, and that he did not know what happened after that.
The appellant admitted that his car was in the parking deck at the Galleria mall. Detective Corvin said the police "needed to look in his car," and the appellant replied, "What if I have something in there I'm not supposed to have?" R. 1012. Corvin said that the police were looking for evidence concerning the disappearance of Candace Brown and asked if the appellant was referring to drugs. The appellant replied that he had "a gun . . . [a] .45 automatic," and that "the only way he would sign a paper consent [for] us to search the car is [if] we wouldn't charge him for carrying a gun." R. 1012-13. Without agreeing to the appellant's condition, Detective Corvin asked the appellant where his car keys were. The appellant handed the keys to Corvin.
Detective Fowler located the appellant's car in the Galleria mall parking deck, opened the trunk, and "made an inventory of what [he] could see visually without moving or handling any objects." R. 791. Fowler observed a .45 caliber automatic pistol in the trunk. The automobile was towed to a secure lot at 4:45 p.m. on May 19. It was searched on May 21 and a number of items were seized pursuant to a search warrant issued that same date.
The appellant was formally arrested at 6:20 p.m. on May 19, 1992, after giving his second statement. The following day, hikers discovered the body of Candace Brown in a *Page 207 
rock quarry on Ruffner Mountain. Ms. Brown had been shot in the back of the head.
The prosecution presented a strong and compelling case of the appellant's guilt. The State's expert testimony tended to show that a pair of wire cutters found during a search of the appellant's vehicle had made the cuts on two pieces of telephone wire leading into the victim's residence, R. 1770; that glass fragments found on a pair of gloves seized from the appellant's automobile were consistent with the glass in the shattered driver's side window of the victim's car and with the glass in the broken window at the rear entry of the victim's residence, R. 1699; that the sole of the appellant's right shoe had the same distinctive tread design as a shoe imprint on a pane of glass from the victim's residence, R. 1721; that the projectile recovered from the victim's head was fired from the .45 caliber pistol found during a search of the appellant's car, R. 1777; and that the DNA profile of a semen stain on the victim's blouse matched the appellant's known blood sample, with a probability that only one in 20,620,000 white males. R. 1602.
 I
The appellant contends that his cross-examination of Birmingham Police Detective Larry Fowler was improperly curtailed when the circuit court would not allow him to question Fowler about the contents of an internal police memorandum outlining an anonymous tip that two suspects other than the appellant had been named in the Candace Brown murder investigation.
The trial court correctly ruled that the content of the memorandum was inadmissible hearsay.
 "Under Alabama law, . . . 'other suspect' information is not admissible. 'It is recognized that an accused is not entitled to prove, without more, that another has been suspected of committing the crime for which the accused is being tried.' C. Gamble, McElroy's Alabama Evidence § 48.01(9) (4th ed. 1991). Most recently, in Tomlin v. State, 591 So.2d 550, 558 (Ala.Cr.App. 1991), this court stated that '[t]he general rule in Alabama is that an accused is not entitled to introduce testimony that someone else was suspected of committing the crime for which he is being tried.' "
Johnson v. State, 612 So.2d 1288, 1293 (Ala.Cr.App. 1992) (emphasis in original).
The circuit court correctly excluded evidence concerning the content of the memorandum.
 II
The appellant claims that 25 photographs depicting the position of the victim's body and the area in which it was discovered were unnecessarily repetitious and inflammatory and should not have been admitted in evidence.
We rejected a similar argument in Hill v. State,516 So.2d 876 (Ala.Cr.App. 1987):
 "The appellant argues that the trial court erred in allowing 24 color photographs into evidence. The photographs in question depicted the position or location of the victim's body, the injuries she suffered, the location of the [murder weapon], and the condition of the bedroom in which the victim was killed.
". . . .
 ". . . 'The photographs were not immaterial but were illustrative of the crime scene and corroborative of the testimony of . . . the first policeman to arrive on the scene. . . . A photograph "is competent evidence of anything, of which it is competent and relevant for a witness to give a verbal description." 23 C.J.S. Criminal Law § 852(1)(a) (1961).' Harrell v. State, [470 So.2d 1303, 1307 (Ala.Cr.App. 1984), affirmed, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985)]."
Hill v. State, 516 So.2d at 881.
The courts of this state have repeatedly held that photographs that accurately depict the crime scene and the nature of the victim's wounds are admissible despite the fact that they may be gruesome or cumulative.
 "[P]hotographs showing external wounds of a deceased victim are admissible even if the evidence is gruesome, cumulative, and relates to undisputed matters. Ex parte *Page 208 Siebert, 555 So.2d 780 (Ala. 1989) [, cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806
(1990)]. Moreover, photographs that depict the position and location of a victim's body at the scene of an offense have been held to be proper. Hill v. State, 516 So.2d 876 (Ala.Cr.App. 1987)."
Oryang v. State, 642 So.2d 979, 989 (Ala.Cr.App. 1993). The circuit court did not err by admitting the photographs.
 III
The appellant argues that his second statement to the police was involuntary.
 "The oft-stated rule is that a confession is prima facie involuntary and inadmissible and the state must show voluntariness and a Miranda predicate in order for it to be admitted. Whether there was a waiver of the right to remain silent and the right to counsel and whether it was knowingly, voluntarily, and intelligently made must be decided from the particular facts and circumstances of each case, including the background, experience, and conduct of accused — the totality of the circumstances. The question of whether a confession was voluntary is initially to be determined by the trial court. Thereafter, the voluntariness as affecting the credibility and weight to be given any statement that an accused has made is a determination for the jury. The finding of the trial court will not be disturbed on appeal unless it appears contrary to the great weight of the evidence or is manifestly wrong. Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial judge need only be supported by substantial evidence and not to a moral certainty. The trial court need only be convinced from a preponderance of the evidence to find a confession to have been voluntarily made. The fundamental requirements for voluntariness are that the court must conclude, in order to find a defendant's confession voluntary, that he made an independent and informed choice of his own free will, that he possessed the capability to do so, and that his will was not overborne by pressures and circumstances swirling around him."
Lewis v. State, 535 So.2d 228, 234-35 (Ala.Cr.App. 1988) (citations omitted).
Through the testimony of Detectives Corvin and Fowler, the prosecution completely established the Miranda predicate. The appellant does not dispute the fact that he was given theMiranda warnings and that he waived his rights before making his second statement. He challenges the admission of the statement solely on the ground that it was coerced and that his will was overborne when, he alleges, during interrogation, he was "[s]tripped of his clothing, shouted at, called the classic Southern 'boy,' manhandled, and frightened into assuming the fetal position." Appellant's Brief at 74.
The appellant did not testify in connection with the motion to suppress his statement. The testimony of Lt. Carl M. Quinn, Detective Steven B. Corvin, and Detective Larry Fowler concerning what occurred during their interview with the appellant was unrefuted. See Jackson v. State, 549 So.2d 616,620 (Ala.Cr.App. 1989); Grayson v. State, 479 So.2d 69, 75
(Ala.Cr.App. 1984), affirmed, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985). All three officers stated that the appellant was not threatened in any way in order to make him confess. All testified that during interrogation the appellant's clothes were taken and that he was given an orange jail uniform to wear. However, there is nothing in the record to indicate that the change of clothes was accompanied by any force or was in any way humiliating to the appellant. There is also nothing in the record to substantiate the appellant's allegation that he was "shouted at."
Lt. Quinn testified that during the interview the appellant changed positions, often curling up "almost into a fetal position," with his head in his hands and his feet pulled up into his chair. R. 167. Lt. Quinn interpreted the appellant's posture to mean that he was "avoiding [Quinn's] questions." R. 169. At one point, Quinn took the appellant's wrist, moved his hand away from his head, R. 21, and said "something to the effect, 'Boy, look up at me when I talk to you.' " R. 168. *Page 209 
According to Detective Corvin, Quinn did not bend or twist the appellant's arm or "do anything inappropriate in talking with [the appellant]." R. 21-22.
The appellant is a 24-year-old white male. Lt. Quinn's addressing him as "boy" obviously was not a racial epithet, and given the appellant's relative youth, did not have the demeaning overtones it might in another situation. Quinn's touching the appellant by moving the appellant's hand away from his head so that the appellant would face Quinn during the interview was not brutal and did not amount to physical coercion. See State v. Joyner, 382 S.W.2d 683, 687 (Mo. 1964) (accused's confession not coerced when officer "touch[ed] defendant's jaw to cause defendant to turn his head so that he would be looking at the questioning officer").
The record indicates that the appellant assumed a "fetal position" before he was questioned or touched by Lt. Quinn and that he constantly shifted positions during the interrogation. The trial court was justified in concluding, as Lt. Quinn did, that the appellant's body language indicated an aversion to the questions rather than a fear of the questioner.
The trial court had substantial evidence upon which to conclude that, under the totality of the circumstances, the appellant's will was not overborne and his statement was not coerced. The court's finding that the statement was voluntary was not "manifestly contrary to the great weight of the evidence" and will be upheld on appeal. Ex parte Matthews,601 So.2d 52, 53 (Ala.), cert. denied, 505 U.S. 1206,112 S.Ct. 2996, 120 L.Ed.2d 872 (1992).
 IV and V
The appellant contends that several items of physical evidence had no probative value and were admitted without the State's establishing a proper predicate and a complete chain of custody. Specifically, the appellant challenges the admission of the following items: State's Exhibits 40-42 (three rocks); Exhibit 97 (a pair of eyeglasses); Exhibits 77 and 105 (two gloves); Exhibit 13 (a piece of window glass); Exhibits 7 and 81 (wire and wire cutters); Exhibits 68 and 70 (jeans and a blouse removed from the body of Candace Brown); Exhibit 83 (jeans belonging to the appellant); and Exhibit 80 (a .45 caliber pistol).
Exhibits 40 through 42 were three rocks collected at the scene where the victim's body was found. They were offered but not admitted in evidence. R. 1731, C.R. 243.
Exhibit 97 was the pair of eyeglasses found next to the victim's body. The prosecution authenticated this item and established its relevance. The glasses were properly admitted over a chain of custody objection because no chain of custody was necessary.
A chain of custody for a tangible item of evidence must be established in only two instances: (1) "Where by its very nature, an item of evidence cannot be specifically identified, . . . [t]he establishment of a chain of custody is necessary in order to show a reasonable possibility that the evidence is what the proponent claims it is and has not been tampered with, contaminated or altered"; and (2) where the condition of the item is at issue in the case, for example, "[w]here a party seeks to introduce the results of expert analysis of a specimen or object, he has the burden of proving that the specimen or object analyzed was, in fact, derived or taken from the particular person or place alleged. This in turn necessitates proving where and by whom the specimen was kept and through whose hands it passed." Schroeder and Hoffman, Alabama Evidence
§ 9-1 at 486 (2d ed. 1993) (footnote omitted).
 "If the offered item possesses characteristics which are fairly unique and readily identifiable, and if the substance of which the item is composed is relatively impervious to change, the trial court is viewed as having broad discretion to admit merely on the basis of testimony that the item is the one in question and is in a substantially unchanged condition."
McCormick on Evidence § 212 at 527 (E. Cleary 2d ed. 1972).
Steven Drexler, a trace evidence technician with the Department of Forensic Science-Birmingham laboratory [hereinafter, "DFS-Birmingham lab"], identified Exhibit 97 as a *Page 210 
pair of eyeglasses he observed next to the victim's body in a rock quarry on Ruffner Mountain on May 20, 1992. R. 1662. Like the already admitted photographs of the scene, the eyeglasses served to illustrate Drexler's testimony concerning the condition and location of the victim's body.
 "Under the liberal test of admissibility in Alabama, 'a fact is admissible if it has any probative value, however slight, upon a matter in the case.' McElroy's § 21.01 at 34. 'Evidence as to the scene of a crime, as to objects found thereat, and as to the condition of the body, is admissible and relevant evidence, when reasonably proximate to the scene in time and location.' Petty v. State, 40 Ala. App. 151, 154, 110 So.2d 319, 322 (1958), cert. denied, 269 Ala. 48, 110 So.2d 325 (1959). Evidence as to objects found at or near the scene of the crime charged within a reasonable time and proximity after the commission of the crime is 'always admissible.' Busbee v. State, 36 Ala. App. 701, 703, 63 So.2d 290, 292 (1953)."
Parker v. State, 587 So.2d 1072, 1090 (Ala.Cr.App. 1991).
The eyeglasses were admissible without establishing a chain of custody because Drexler was able to specifically identify them, and their condition was not an issue in the case. Drexler testified that he recognized the glasses because of the distinctive reddish-brown smears on the lenses. R. 1666. SeeEx parte Works, 640 So.2d 1056, 1059 (Ala. 1994) ("because the condition [of] the knife was not an issue in this case, and its authenticity was established by other means, it was not necessary to establish a chain of custody"); Pardue v. State,571 So.2d 320, 329 (Ala.Cr.App. 1989) ("[w]hen the condition of the evidence is not at issue, . . . it is not always necessary to establish a chain of custody"), reversed on other grounds,571 So.2d 333 (Ala. 1990). Compare Miller v. State,602 So.2d 488, 494 (Ala.Cr.App. 1992) ("[t]his Court finds that the opal ring was properly admitted into evidence, despite the broken chain of custody, because the ring was positively identified at trial and because there was no reasonable probability that the ring introduced at trial was different from the ring discovered in the appellant's pocket").
The State was required to establish a complete chain of custody for the cigarette butts and socks collected at the scene of the homicide in Ex parte Cook, 624 So.2d 511 (Ala. 1993), but not for the eyeglasses collected at the scene of this homicide because the items in Cook, unlike the eyeglasses here, were subjected to scientific analysis and their condition was at issue.
State's Exhibits 77 and 105 were two gloves found in the appellant's car. The admission of these exhibits required the prosecution to establish a complete chain of custody because the gloves contained glass particles and blood stains, both of which were the subject of an expert opinion linking the appellant to the victim. However, contrary to the appellant's argument, the the prosecution did establish an unbroken chain of custody for these gloves.
 "The chain of custody is composed of 'links.' A 'link' is anyone who handled the item. The State must identify each link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to each link's possession of the item: '(1) [the] receipt of the item; (2) [the] ultimate disposition of the item, i.e., transfer, destruction, or retention; and (3) [the] safeguarding and handling of the item between receipt and disposition.' Imwinklereid, The Identification of Original, Real Evidence, 61 Mil.L.Rev. 145, 159 (1973).
 "If the State, or any other proponent of demonstrative evidence, fails to identify a link or fails to show for the record any one of the three criteria as to each link, the result is a 'missing' link, and the item is inadmissible. If, however, the State has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the 'link,' as to one or more [of the] criteria or as to one or more links, the result is a 'weak' link. When the link is 'weak,' a question of credibility and weight is presented, not one of admissibility." *Page 211 
Ex parte Holton, 590 So.2d 918, 920 (Ala. 1991).
On May 21, pursuant to a search warrant, evidence technician Steven Drexler removed the gloves from the appellant's car. Drexler processed the gloves to remove surface debris and tested that debris. R. 1693. He then packaged the gloves, sealed the package, and marked the package with his identifying marks. R. 1688-89. The gloves remained in Drexler's care, custody and control until he delivered them, in sealed condition, to Phyllis Rollan, forensic serologist with the DFS-Birmingham lab. R. 1691. Ms. Rollan performed tests on the gloves, R. 1517-18, and then resealed them and turned them over to Sgt. Dawn Lacey, supervisor in charge of the evidence collection unit of the Birmingham Police Department. R. 1273. Sgt. Lacey took a box containing State's Exhibits 77 and 105, still sealed, to the property room of the Birmingham Police Department, where the exhibits remained until trial. For State's Exhibits 77 and 105, the prosecution proved a complete chain of custody under Holton.
Birmingham police Officer Greg Bearden removed State's Exhibit 13, a piece of window glass, from the back porch of Candace Brown's residence, and kept it in his care, custody, and control until he took it to the DFS-Birmingham lab, R. 1173. Steven Drexler received the glass from Officer Bearden, R. 1696, performed tests on it, and then packaged it and sealed the package and turned it over to Sgt. Dawn Lacey of the Birmingham Police Department. Sgt. Lacey took the exhibit, still sealed, to the police department property room, R. 1276, where it remained until Officer Bearden retrieved it, still sealed, and brought it to trial. R. 1175-76. There was no break in the chain of custody under Holton for State's Exhibit 13.
State's Exhibit 7 was identified by Officer Greg Bearden as a piece of telephone wire he cut from outside the victim's residence on May 19, 1992. R. 1166. Bearden placed the wire in an envelope, sealed and initialled it, and took it to the DFS-Birmingham lab. R. 1167. David Higgins at DFS received the wire from Officer Bearden, R. 1765, performed tests on it, resealed it, and turned it over to Sgt. Dawn Lacey, R. 1770, who took it to the Birmingham Police Department property room. Officer Bearden retrieved the envelope, still sealed, from the property room and brought it to trial. R. 1169-70, 1176. The chain of custody for Exhibit 7 was unbroken underHolton.
State's Exhibit 81 was identified by evidence technician Steven Drexler as a pair of yellow-handled wire cutters he removed from the backseat of the appellant's automobile. R. 1683. Drexler sealed the cutters in an envelope, initialled it, and kept it in his care, custody, and control until he turned it over to David Higgins at the DFS-Birmingham lab. R. 1684. Higgins received the cutters from Drexler, performed tests with it, R. 1766, resealed it, R. 1770, and turned it over to Sgt. Dawn Lacey, R. 1265, 1771, who took it, still sealed, to the property room of the Birmingham Police Department. R. 1276. Officer Bearden retrieved it from the property room and brought it to trial. R. 1176. The prosecution met the requirements ofHolton for Exhibit 81.
State's Exhibits 68 and 70 were identified by Dr. Gary T. Simmons, Jefferson County associate coroner, as the blue jeans and blouse he removed from the body of Candace Brown and turned over to Deputy Coroner Paul Price. R. 1413. Price hung the clothes to dry in a secure area of the evidence room, R. 1460, and then separately packaged the items, and sealed and initialled the packages, and delivered them to Officer Greg Bearden, R. 1462, 1464. Officer Bearden received three sealed packages, two of which were Exhibits 68 and 70, from Paul Price in the coroner's office. Price told Bearden that the packages contained the clothing of the victim. R. 1191-93. Bearden took the sealed packages to the Birmingham Police Department property room. R. 1196. Bearden later retrieved the packages containing Exhibits 68 and 70, still sealed, from the property room and delivered them to the DFS-Birmingham lab. R. 1193-94. Although Bearden did not identify the person at DFS to whom he gave the packages, Steven Drexler at the DFS-Birmingham lab testified that he received Exhibits 68 and 70, which were represented *Page 212 
to him as being the clothing of the victim. R. 1679. Drexler turned the clothes over to Phyllis Rollan. R. 1521. Ms. Rollan tested the exhibits for the presence of blood and semen. On two separate occasions she cut out a small piece of Exhibit 70, the victim's blouse, and forwarded it to Elaine Scott, a forensic serologist at the DFS-Mobile lab, for DNA analysis. On the first occasion, Ms. Rollan labelled, packaged, and sealed the cut piece of the blouse and personally handed it to Ms. Scott when the two were present in court together in Birmingham. R. 1568. On the second occasion, Ms. Rollan labelled, packaged, and sealed the cut piece of the blouse and sent it by certified mail to Ms. Scott. R. 1529-30, 1568. Elaine Scott testified that she received two samples cut from State's Exhibit 70, the victim's blouse, in a sealed condition, from Phyllis Rollan and subjected those samples to DNA testing. R. 1586-87. There was no testimony regarding the disposition of Exhibits 68 and 70 after Ms. Rollan completed her testing.
In Ex parte Works, the Alabama Supreme Court held that the prosecution had failed to establish an unbroken chain of custody because "the State did not . . . identify the person who received the knife in the Department of Forensic Sciences." 640 So.2d at 1059. In Works, the prosecution also failed to
 "identify the person in the Department of Forensic Sciences who ultimately disposed of the knife, [and] show the safeguarding and handling of the knife while it was in the custody of the Department of Forensic Sciences. Thus, there was a missing link in the chain of custody of the knife [and the knife was, therefore, inadmissible]."
Ex parte Works, 640 So.2d at 1059. In contrast to Works, Officer Bearden's failure to identify the person at DFS-Birmingham lab to whom he delivered the exhibits was, under the particular circumstances of this case, a weak, rather than a missing link in the chain of custody.
Although Officer Bearden did not identify the person at DFS to whom he gave Exhibits 68 and 70, it can be inferred that Steven Drexler was the recipient of the evidence. Bearden testified that the exhibits had been identified to him as the clothing of the victim, and Drexler testified that when he received the exhibits they were represented to him as the clothing of the victim. In addition, Officer Bearden had delivered other evidence in this case to Mr. Drexler at DFS (State's Exhibit 13, the pane of window glass from the victim's residence). Drexler was "head of [the] crime scene team at the time." R. 1509. Both Drexler and Rollan, who subsequently handled the exhibits, testified extensively regarding their safeguarding of the evidence. Each received items in marked and sealed packages, and, when testing was complete, they resealed those packages.
Furthermore, the possibility that the evidence was tampered with once it arrived at DFS-Birmingham lab is so remote as to be negligible.
 "The purpose . . . of establishing a chain of custody is to satisfy the court that it is reasonably probable that the exhibit is authentic and that no one has altered or tampered with the proffered physical exhibit. . . . A chain of custody only need be proved to a reasonable probability. One need not negate remote possibilities of substitution, alteration, or tampering with proffered physical evidence in order to establish a proper chain of custody."
J. Colquitt, Alabama Law of Evidence § 9.1(c) at 484 (1990) (footnotes omitted). See also Green v. Alabama Power Co.,597 So.2d 1325, 1328-29 (Ala. 1992); Ex parte Williams,548 So.2d 518, 520 (Ala. 1989).
Although there was no testimony concerning the disposition of Exhibits 68 and 70 after Ms. Rollan and Ms. Scott completed their testing,
 "[h]ere, as when dealing with a controlled substance, 'the law is concerned with tracing the integrity of the substance only up through the completion of the analysis.' Congo v. State, 409 So.2d 475, 479 (Ala.Cr.App. 1981), cert. denied, 412 So.2d 276 (Ala. 1982). 'Any alteration or substitution of the items after [the expert] finished her analysis and comparison would, therefore, have been immaterial.' Blanco v. State, 485 So.2d 1217, 1219 (Ala.Cr.App. 1986)." *Page 213 
Parker v. State, 587 So.2d 1072, 1089 (Ala.Cr.App. 1991). See also Smith v. State, 588 So.2d 561, 581 (Ala.Cr.App. 1991). Exhibits 68 and 70 were properly admitted into evidence.
State's Exhibit 83 was identified by Officer Greg Bearden as a pair of blue jeans he collected from the appellant on May 19 at the police administration building. R. 1181, 1184-85. Officer Bearden put the jeans in a bag, sealed and initialed the bag, and kept it in his care, custody, and control until he delivered it, in a sealed condition, to the DFS-Birmingham lab. R. 1185, 1188. Bearden did not identify the person at DFS to whom he gave the bag. Phyllis Rollan testified that she received a sealed bag containing State's Exhibit 83 from Steven Drexler. R. 1534. She tested the blue jeans for the presence of blood and semen and found no semen. R. 1537-38. Although she detected the presence of blood on the jeans, "There was not enough blood present to do an ABO typing test." R. 1537. Ms. Rollan was not asked, and she did not testify as to, what she did with the blue jeans after her testing. Sgt. Dawn Lacey testified that she received State's Exhibit 83, in a sealed package, from the DFS-Birmingham lab, R. 1271. She boxed the exhibit, along with other evidence she had received from the lab, and turned it over to the property room of the Birmingham Police Department. R. 1274-75.
The chain of custody for State's Exhibit 83 suffers from the same weaknesses as the chain for Exhibits 68 and 70. However, the same principles apply to render the appellant's blue jeans admissible over a chain of custody objection. Here, the inadequacies in the chain of custody constitute weak rather than missing links. A weak link presents a question of weight and credibility rather than a question of admissibility.Sommer v. State, 489 So.2d 643, 645 (Ala.Cr.App. 1986).
State's Exhibit 80 was identified by Steven Drexler as the pistol he removed from the appellant's automobile on May 21, 1992, pursuant to a search warrant. R. 1710. Without altering the pistol in any way, Drexler kept the pistol in his care, custody, and control until he turned it over to David Higgins at the DFS-Birmingham lab the next day. R. 1711. Higgins performed tests on the pistol and then turned it over to Phyllis Rollan at DFS. R. 1518. Mrs. Rollan subjected the pistol to tests to detect the presence of blood. Although she found blood on the side of the weapon and in the barrel, she did not perform a blood-typing test. R. 1519-20. Ms. Rollan did not testify as to what she did with the pistol after the completion of her tests. Officer Greg Bearden testified that he retrieved the pistol from David Higgins at DFS and brought it to trial. R. 1452.
Although there was a break in the chain of custody of the pistol after Ms. Rollan completed her tests, the prosecution proved a complete and unbroken chain of custody for the pistol through the completion of the testing process, specifically through the completion of the testing done by Higgins, whose expert testimony established that the projectile found in the victim's head had been fired from Exhibit 80. As we have previously observed, under these circumstances, "the law is concerned with tracing the integrity of the substance only up through the completion of the analysis." Congo v. State, 409 So.2d at 479, quoted in Parker v. State, 587 So.2d at 1089, andSmith v. State, 588 So.2d at 581. Ms. Rollan did not give any expert testimony regarding her examination of the pistol, other than to note that there was blood on the gun. She did not give an opinion about the origin or type of that blood. In our judgment, State's Exhibit 80 was admissible over a chain of custody objection.
 VI
The appellant contends that evidence obtained during a warrantless search of his automobile was inadmissible. Because the car was searched pursuant to a warrant on May 21, we assume the warrantless "search" to which the appellant is referring was Detective Fowler's May 19 visual inspection of the trunk, during which he saw the pistol.
Since the appellant had already told Detective Fowler that he had a .45 caliber pistol in his car, we fail to see how the appellant's privacy rights were violated by *Page 214 
Fowler's looking in the car and seeing the pistol there. "InBurrell [v. State, 45 Ala. App. 664, 666, 235 So.2d 913 (1970),] this Court held that where the defendant volunteered the whereabouts of a gun, there simply was no search." Hubbard v.State, 382 So.2d 577, 592 (Ala.Cr.App. 1979), affirmed,382 So.2d 597 (Ala. 1980), set aside on other grounds,405 So.2d 695 (Ala. 1981).
However, if Detective Fowler's opening the trunk and visually inspecting the interior did constitute a "search" within the meaning of the Fourth Amendment, that search was authorized under both the consent and the probable cause plus exigent circumstances exceptions to the warrant requirement.
"[C]onsent to search may be given on actions alone."Morgan v. State, 518 So.2d 186, 189 (Ala.Cr.App. 1987) (quotingHubbard v. State, 382 So.2d at 592). It was "reasonable to conclude that when the defendant handed the keys to the police officer he voluntarily relinquished all expectation of privacy." Hubbard v. State, 382 So.2d at 592. In this case, "[t]here is not even any evidence that the police demanded the keys but only that [the officer] asked the defendant where the keys were." Id.
The appellant's statement that he would sign a consent-to-search form if the officer agreed not to charge him "for carrying a gun," R. 1013, does not demonstrate that his consent was involuntarily induced by the hope of a benefit. Detective Corvin testified that he did not agree to the appellant's proviso. The proviso was simply a unilaterally imposed condition which the appellant acknowledged was not met when he refused to sign a consent to search form. CompareSiebert v. State, 555 So.2d 772, 776-77 (Ala.Cr.App.) (accused's confession not involuntarily induced by promise of benefit when police officer acknowledged terms which accused had unilaterally imposed on extent of his confession), affirmed, 555 So.2d 780, 782 (Ala. 1989), cert. denied,497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990).
The very fact that the appellant imposed a condition on his giving written consent to search indicates that he thought he had the right to refuse consent. See Daniels v. State,534 So.2d 628, 654 (Ala.Cr.App.) ("declaration [by accused's wife] to the officers that she would rather her husband sign the written release indicates that she knew she was being asked, rather than ordered, to permit the search and that she had a right to refuse permission"), affirmed, 534 So.2d 656 (Ala. 1986), cert. denied, 479 U.S. 1040, 107 S.Ct. 898,93 L.Ed.2d 850 (1987). The appellant's apparent ignorance of the fact that an oral consent to search is as valid as a written one does not make his oral consent involuntary. Compare Connecticut v.Barrett, 479 U.S. 523, 530, 107 S.Ct. 828, 832-33,93 L.Ed.2d 920 (1987) (wherein the Court, holding that accused who agreed to give an oral, but not a written, statement without counsel had waived the right to counsel with regard to the oral statement, observed: "[W]e have never 'embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness' ") (quoting Oregon v.Elstad, 470 U.S. 298, 316, 105 S.Ct. 1285, 1297, 84 L.Ed.2d 222
(1985)).
Before the appellant gave his car keys to Detective Corvin, he was aware that he had been caught in two lies concerning his involvement in the May 18 burglary of Ms. Brown's house and the location of his car. He was specifically made aware that the police "were looking for evidence about the disappearance of Candace Brown." R. 1012. He stated that he would not sign a written consent to search unless he was promised he would not be charged in connection with the gun. Officer Corvin did not agree to the appellant's unilaterally imposed condition or solicitation of a benefit. Nevertheless, the appellant handed over his car keys to Detective Corvin. Based on the foregoing evidence, there is no reasonable basis for a claim that the appellant did not consent to the officers' looking in his car.
 A person may consent to a search without a warrant and thereby waive any protection afforded by the Fourth Amendment to his right of privacy. Duncan v. State, 278 Ala. 145, 176 So.2d 840
(1965). Consent to a search must be knowingly, intelligently, and freely given. Id. Based upon the evidence set out above, we conclude *Page 215 
that the defendant did satisfy these criteria in his consent to the searches of his . . . automobile. Further, the record establishes that the defendant gave the consent with knowledge that he was a suspect in the [Candace Brown] murder case. The trial court's ruling on this issue is supported by substantial evidence. See Prince v. State, 420 So.2d 856 (Ala.Crim.App. 1982)."
Ex parte Wilson, 571 So.2d 1251, 1255 (Ala. 1990).
If a search of the appellant's vehicle occurred on May 19, it was also authorized under the probable cause plus exigent circumstances exception to the warrant requirement. By the time Detective Fowler opened the appellant's trunk, the police had the following information: that the residence of Candace Brown had been burglarized on May 13, and Ms. Brown had named the appellant as a suspect in that burglary[2]; that the appellant had admitted his involvement in the May 13 burglary, including the fact that he had cut the telephone lines to Ms. Brown's house on that occasion; that the appellant had initially denied but later admitted his involvement in the May 18 burglary of Ms. Brown's house; that the appellant's description of what happened during the May 18 burglary, specifically the fact that Ms. Brown had bled on the kitchen floor, was inconsistent with the physical evidence, or the lack thereof, at the scene of the burglary; that the appellant had lied about the location of his vehicle; and that the tread design on the appellant's tennis shoes appeared to match a shoe imprint on a pane of glass at the scene of the burglary.
This "totality of circumstances" and information was sufficient to " 'warrant a man of reasonable caution in the belief,' " that an offense had been committed and that the appellant committed it. Texas v. Brown, 460 U.S. 730, 742,103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983) (quoting Carroll v.United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288,69 L.Ed. 543 (1925)). "[G]enerally, a vehicle may be searched on probable cause without a warrant and without a demonstration of any exigent circumstances other than its own inherent or ready mobility." Stanfield v. State, 529 So.2d 1053, 1060
(Ala.Cr.App. 1988). See generally Mewbourn v. State,570 So.2d 805, 810 (Ala.Cr.App. 1990).
The appellant's vehicle was not the subject of an unlawful search.
 VII
The appellant argues that State's Exhibit 7, two pieces of telephone wire, were erroneously admitted into evidence because firearms and toolmarks examiner David Higgins tested the wrong end of the wire.
Officer Greg Bearden took samples of that portion of the telephone wire that had apparently been severed by Ms. Brown's assailant. He testified as follows:
 "Q. [By the prosecutor:] And State's Exhibit Number 7, the phone line that you collected out there [at] the scene, you said that you took those to the State Department of Forensic Sciences, is that correct?
"A. Yes, sir, that's correct.
 "Q. Between the time you collected those items and you turned them over to the State Department of Forensic Sciences, were those items in your care, custody, and control the entire time?
"A. That's correct.
 "Q. Did you make any additions or deletions to those items between the time you collected them and the time you turned them over to the State Department of Forensic Sciences?
 "A. I placed tape on one end of each piece of phone wire where they would know — I mean, I told them which — that that was what we were interested in testing. I had to make some kind of — I wanted the ends of the wire left like they were, so I put tape around the two ends of the wire that they were going to compare." R.1167-68
". . . .
 "Q. [By defense counsel:] Now, the taped ends are the ends you cut?
". . . . *Page 216 
 "A. No, sir, I believe the taped ends — the reason I taped the ends was to keep anything from happening to the ends.
"Q. So the other ends were the ends you cut?
"A. Yes, sir. . . ." R. 1220-21.
David Higgins testified that he microscopically compared the flat-cut ends of State's Exhibit 7, the wire allegedly severed by the intruder to Ms. Brown's residence, with test cuts he made on other telephone wire by State's Exhibit 81, the shears found during a search of the appellant's vehicle. He concluded that the "shears found in State's 81 made the cuts that were found on State's Exhibit 7." R. 1770. On cross-examination by defense counsel, the following occurred:
 "Q. This is State's Exhibit 7. I believe that's what you identified as the wire that Greg Bearden gave you?
"A. Yes, sir.
 "Q. Which end of that wire did you check, Mr. Higgins?
"A. The end that had the tape on them.
"Q. That's the one you checked?
 "A. As I recall, as noted, yes, sir. I believe that this — this end, the flat end, not the taped one. I believe the tape was put there to cover it up so I knew not to look at that end. I had talked to Mr. Bearden earlier about the collection of that and in the course of that conversation, as I recall, he said that he had cut his — did his cuts angular and this is straight. I normally make a note of it, I failed to do it in this case, in this particular instance. This is the wire that's marked and by placing these back I can see they readily correspond one to the other, where on the taped ends, the angles of each of those ends are different.
 "Q. The question is, which end did you check? That's what I want to know.
"A. This one right here, the flat one.
 "Q. All right. So you checked the end that was not covered by the tape?
 "A. I don't recall if it was covered by the tape when it came in. I can see I was remiss, I did not note that. But I probably put the tape on the other end to preclude it — " R. 1795-96.
". . . .
 "Q. Is there a possibility that when you received these two pieces of wire that was marked State's 7 that Bearden had the ends that he wanted you to test taped up to protect those ends?
"A. It could have been, yes, sir.
 "Q. So you don't know which end was taped when you got them?
 "A. I don't honestly recall. And as I said, sir, I apologize. I was remiss. I did not note it." R. 1799-1800.
When State's Exhibits 7 and 81 were introduced in evidence, defense counsel objected on the basis of "improper chain and improper predicate." R. 1772. The defense did not object to the testimony of Mr. Higgins on any ground. The argument the appellant now makes on appeal is directed to the alleged inadmissibility of Higgins's opinion rather than to the inadmissibility of the physical evidence in State's Exhibits 7 and 81.
 " 'However, since this is a death case, we must review the [alleged] error before us to see if it constitutes plain error and, thus, should be noticed despite the lack of a proper objection by defense counsel. Rule 45A, A.R.A.P. In considering what constitutes "plain error" in a capital case, the Alabama Supreme Court has looked to the federal court's interpretation of what is "plain error." See Ex parte Harrell, 470 So.2d 1309 (Ala. 1985); Ex parte Womack, 435 So.2d 766 (Ala. 1983).
 " 'In United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the Supreme Court stated that the plain error doctrine should be used to correct only "particularly egregious errors" . . . which are those errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings". . . . The plain error rule should be applied "solely in those circumstances on which a miscarriage of justice would otherwise result." Young, supra [470 U.S., at 15] 105 S.Ct., at 1046. . . .
 " 'Furthermore, the court noted that the plain error doctrine requires that the "claimed error not only seriously affects *Page 217 
'substantial rights' [of the defendant], but that it had an unfair prejudicial impact on the jury's deliberations. Only then would [a] court be able to conclude that the error undermined the fairness of the trial and contributed to a miscarriage of justice." Young, supra, 470 U.S., at 16, n. 14, 105 S.Ct., at 1047, n. 14.' Hooks v. State, 534 So.2d 329, 351-52 (Ala.Cr.App. 1987), affirmed, 534 So.2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989)."
Kuenzel v. State, 577 So.2d 474, 481-82 (Ala.Cr.App. 1990), affirmed, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886,112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
We conclude that there was no error in the admission of David Higgins's expert opinion that the shears found in the appellant's car made the cuts on the telephone wire leading into the victim's residence. Although Higgins gave seemingly inconsistent testimony about whether he tested the taped or the untaped ends of the wire, it is evident from a careful reading of both his and Officer Bearden's testimony that Higgins was only uncertain about which ends of the wire were taped when he received them — and not about which ends of the wire he tested.
Officer Bearden testified that he "told them [at the Department of Forensic Sciences] which — that that was what we were interested in testing," R. 1168. Mr. Higgins testified that he "had talked to Mr. Bearden earlier about the collection of [the wire] and in the course of that conversation, . . . [Bearden] said that he had cut his — did his cuts angular and this [the part Higgins tested] is straight." R. 1795-96.
Reading all the relevant portions of the record together, it is apparent that Officer Bearden actually told or showed Mr. Higgins which end of the wire he intended to submit for testing, and that Higgins in fact tested the portion of the wire that Higgins identified. At most, Higgins's seemingly inconsistent testimony presented a question for the jury. "The weight and probative value to be given to the evidence, the credibility of the witnesses and the resolution of conflicting testimony are for the jury's determination." Brown v. State,588 So.2d 551, 559 (Ala.Cr.App. 1991).
There was no plain error in the admission of Higgins's testimony.
 VIII
The appellant maintains that the prosecutor's remark during closing argument, "Jeff, tell us the truth, tell us the truth," R. 2012, constituted a comment on his failure to testify.
At trial, the defense did not object to the remark. That failure to object, however, does not foreclose our review on appeal.
 "In a death penalty case, of course, a defendant's failure to raise a claim of error at trial does not preclude this Court from reviewing the record for 'plain error' and taking appropriate action whenever plain error appears. A.R.App.P., Rule 39(k); see Ex parte Waldrop, 459 So.2d 959 (Ala. 1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985).
 " 'Error' is 'plain error' only when it 'has or probably has adversely affected the substantial rights of the [defendant],' Rule 39(k), A.R.App.P., and plain error is to be acted upon 'in the same manner as if the defendant's counsel had preserved and raised [the] error for appellate review.' Johnson v. State, 507 So.2d 1351, 1356 (Ala. 1986)."
Ex parte White, 587 So.2d 1236, 1237 (Ala. 1991), cert. denied,502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992).
We find no error, plain or otherwise, in the prosecutor's comment. Viewed in context, it is evident that the remark was not a comment on the appellant's failure to testify, but a comment on the appellant's failure to tell the truth in his statement to the police. The relevant portion of the closing argument is as follows:
 "They arrested him, ladies and gentlemen, for murder. They arrested him following his statement to the Birmingham Police Department: 'I wasn't there, I didn't have anything to do with it. I don't know what you're talking about. I was over at my girlfriend's house, my car was out at Marie Fortis's.' *Page 218 
 "They take his shoes. They call Marie, they come back and say, 'Hey, Jeff, Marie ain't got your car. And your shoes match the shoeprint out there [at] the scene. What you got to say? Tell me the truth.
 " 'Well, I'll talk to you but not if that thing's running. I'll talk to you, I don't want it recorded like that. I'll tell you what happened.'
 "So then the defense wants you to believe that we have so intimidated this man he is going to confess to breaking in a house that we haven't even told him anything about. He talks to you about how he went in the window. That was known at 8:30 that morning. How he broke the glass to go in that window. It's broken, it's stacked up.
 "How he was wearing the same clothes that he's got on right now. That matches the footprint out on the scene.
 "How he went inside, committed the burglary. They wanted to commit a burglary. . . . What do you do during a burglary? You steal. You steal.
 "He gets inside with these two, with these two fictional human beings, I guess, and he gets scared and leaves because he realizes he is in some deep trouble. He has got to get out of this thing somehow. He ain't about to admit to committing the killing, so he is going to lay it off on Tony and Edward. 'Oh, I got scared and left. And I had my car and I drove home and I went over — I went on to work.' That means he has got his car the entire time. And where do we find the gun that fires the bullet into Candy Brown's head? We find it in the trunk of his automobile at 4:00 o'clock that afternoon. And he's got the keys until such time the Birmingham Police Department take them from him. He's got the keys.
 "There was a bullet found inside that house by the front door. It is consistent with having been fired out of this gun. Remember that.
 "Of course, Mr. Land, even in the statement where he talks to the police, starts hedging his bets and covering his tail a little bit. Said, 'Oh, I got scared after she got hit by Tony and Edward and there was blood everywhere and that's how it got on my hands — on my gloves and on my pants.'
 "Phyllis Rollan, did you go out there and luminol that place? Yep, no blood.
 " Jeff, tell us the truth, tell us the truth." R. 2009-2012 (emphasis added).
The prosecutor's comment was neither a direct nor an indirect reference to the fact that the appellant failed to take the witness stand. Because the remark was prefaced by a reference to the appellant's "statement where he talks to the police," R. 2011, we do not believe there was a chance that the jury could have construed the comment to refer to the appellant's failure to testify.
 " 'Alabama law clearly holds that "[w]here there is the possibility that a prosecutor's comment could be understood by the jury as reference to failure of the defendant to testify, Art. I, § 6 [Const. of Ala. of 1901] is violated." ' Ex parte Wilson, 571 So.2d 1251, 1262 (Ala. 1990). However, 'a prosecutor may legitimately base his argument on the evidence of the appellant's statement' to the police. Hereford v. State, 608 So.2d 439, 442
(Ala.Cr.App. 1992). See also Henderson v. State, 584 So.2d 841, 855 (Ala.Cr.App. 1988); Smith v. State, 588 So.2d 561, 570 (Ala.Cr.App. 1991); Kimble v. State, 545 So.2d 228, 230 (Ala.Cr.App. 1989); Brinks v. State, 500 So.2d 1311, 1314-15
(Ala.Cr.App. 1986). 'Argument by the prosecution concerning omissions and inconsistencies in the defendant's version of the case is not improper.' Salter v. State, 578 So.2d 1092, 1096 (Ala.Cr.App. 1990), cert. denied, 578 So.2d 1097 (Ala. 1991)."
Mosely v. State, 628 So.2d 1041, 1042 (Ala.Cr.App. 1993). Here, "the prosecutor's comment refers to what the appellant 'did say rather than what he did not say.' Brinks v. State,500 So.2d 1311, 1315 (Ala.Cr.App. 1986). See also Kimble v. State,545 So.2d 228 (Ala.Cr.App. 1989)." Kelley v. State, 602 So.2d 473,478 (Ala.Cr.App. 1992) (prosecutor's rhetorical question, "What is the whole story?" did not refer to accused's failure to take the stand but to accused's failure to provide satisfactory explanation of his actions to police at time of questioning). *Page 219 
There was no error in the prosecutor's closing argument.
 IX
The appellant contends that "[t]he prosecution improperly elicited testimony that was calculated to be inflammatory, prejudicial, and impossible to cure." Appellant's brief at 92. This argument relates to testimony concerning a photograph of a fox taken at the rock quarry where the victim's body was found.
Detective Larry Fowler testified that, on the morning of May 20, he went to the rock quarry at Ruffner Mountain where the victim's body had been found. Fowler then identified 25 photographs taken at the scene. The prosecutor presented these photographs to Fowler in groups of 3 to 5. When the last group of photographs was shown to Fowler, the following occurred:
 "Q. [By the prosecutor:] State's Exhibit 37, 38, 39, and 43, can you tell us what those items are, please, sir?
 "A. Yes, sir. 37 is a photograph of the rocks that the victim was lying on. 38 is another photograph of the rocks where the victim was lying. And 39 is also a photograph of the rocks where the victim was lying. 43 is a photograph of a fox.
"Q. Can you tell us where the fox was seen?
 "MR. DODD [defense counsel]: Excuse me, Judge, objection. That has absolutely nothing to do with this case and that's why we wanted to object in advance. It has absolutely no evidentiary value. We object.
 "THE COURT: We'll discuss it over lunch. Don't want to argue in front of the jury.
 "MR. MATHIS [defense counsel]: We would move that any further discussion of that particular photograph be curtailed at this time.
"THE COURT: Sure." R. 805-06.
Although the prosecutor immediately thereafter asked Detective Fowler if "State's Exhibit Number 37, 38, 39, and 43 truly and accurately depict[ed] the scene as it appeared out there on the 20th where the body of Candace Brown was found," R. 806-07, no further mention was made before the jury of the fox.
When the jury recessed for lunch, the attorneys and the trial judge discussed the admissibility of the photographs identified by Fowler. With regard to State's Exhibit 43, the following occurred:
 "MR. DODD: State's 43 is depicting the fox. We objected at the time, Your Honor. We would object again, [it] absolutely has no value in this case and should not have been admitted. And furthermore —
"THE COURT: It is not admitted.
 "MR. DODD: — we would move again for a mistrial for it being mentioned.[3]
"THE COURT: Overrule." R. 830-31 (footnote added).
The prosecutor then argued that the photograph was relevant to show "that had this body been out there another half a day, the wild animals would have been working on this body," R. 834, and he elicited testimony from Fowler in an attempt to support his argument. However, the trial court adhered to its ruling that the photograph was not to be admitted. The defense then renewed its motion for a mistrial:
 "MR. DODD: Judge, we would renew our motion for a mistrial. And I'm glad Mr. Anderton [the prosecutor] pointed out what he was attempting to show to the jury because that's just what the jury would have garnered from that. It's already before the jury, no reason for that picture to ever be presented before this jury or testimony about a fox or any other thing other than evoke emotion from that jury that that poor deceased girl out there might have been eaten by some wild animal, which has absolutely nothing to do with this case. And it has absolutely prejudiced this jury and we would move for a mistrial." R. 835.
The trial court again denied the motion.
"[A] mistrial 'specifies such fundamental error in a trial as to vitiate the result,' Diamond v. State, 363 So.2d 109, 112 *Page 220 
(Ala.Cr.App. 1978), and should be granted only when a 'high degree of "manifest necessity" ' is demonstrated, Wadsworth v.State, 439 So.2d 790, 792 (Ala.Cr.App. 1983), cert. denied,466 U.S. 930, 104 S.Ct. 1716, 80 L.Ed.2d 188 (1984)." Garnett v.State, 555 So.2d 1153, 1155 (Ala.Cr.App. 1989). If any error occurred by the mere mention of the fox, it was clearly not the fundamental error that is required for the granting of a mistrial. The photograph was never admitted, and there were only two brief references to the fox made before the jury. The trial court granted defense counsel's request that "further discussion of that particular photograph be curtailed at this time," and the fox itself was never again mentioned in the jury's presence.
Although the pathologist testified that the victim's body bore marks that might have been the result of insect bites, there was absolutely no indication that the body had been despoiled in any way by wild animals. Moreover, the place where the body was found was clearly an undeveloped area and one might expect that wild animals could be seen there. In view of these facts and the fact that there were almost 1200 pages of trial testimony, it is doubtful that the two brief references to the fox made much of an impression upon the jurors. SeeRowell v. State, 647 So.2d 67, 69-70 (Ala.Cr.App. 1994). Under the facts of this case, including the strong evidence presented by the State, any error occasioned by the references to the fox was clearly harmless. See generally Ex parte Greathouse,624 So.2d 208, 210-11 (Ala. 1993). Cf. State v. Johnson,298 N.C. 355, 259 S.E.2d 752, 765 (1979) (introduction of photographs depicting body of child victim when found some two months after the murder, which had been dismembered by wild animals was "harmless error beyond a reasonable doubt in the guilt determination phase of the trial").
 X
The appellant asserts that the prosecution violated Brady v.Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose, prior to trial, that a child's handprints were found on the glass that had been removed from the rear window of the victim's home. The short answer to this argument is that these prints were not Brady material.
A defendant seeking to establish a Brady violation must show: "1. that the prosecution suppressed the evidence; 2. that theevidence was of a character favorable to the defense; and 3. that the evidence was material." Ex parte Dickerson,517 So.2d 628, 630 (Ala. 1987) (emphasis added). Accord Johnson v. State,612 So.2d 1288, 1293 (Ala.Cr.App. 1992). While none of these requirements appears to have been met in this case, it is readily apparent that the complained of evidence was not favorable to the appellant. Evidence that is "favorable to the defense" is evidence that " 'if disclosed and used effectively, . . . may make the difference between conviction and acquittal.' " Patton v. State, 530 So.2d 886, 890 (Ala.Cr.App. 1988) (quoting United States v. Bagley, 473 U.S. 667, 676,105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985)).
Sandy Triplett, a latent print examiner, testified that she obtained three readable prints from the panes of glass found on the back porch of the victim's residence. None of these prints matched the appellant's prints. However, Ms. Triplett stated that these prints were "[m]uch smaller, at least a fourth of [the] size" of an adult print, R. 1316, and that these prints were "consistent . . . with having been left by a small child," R. 1323. It had previously been established that the victim had a two-year-old son who lived with her.
These prints obviously do not fall within the definition of evidence favorable to the defense. Evidence that is not favorable to the defense does not fall within Brady. Carr v.State, 640 So.2d 1064, 1073 (Ala.Cr.App. 1994).
 XI
The appellant complains that the trial court's instructions to the jury gave "more weight to a finding of guilty rather than one of not guilty." Appellant's brief at 107.
With the explicit consent of defense counsel, the trial court delivered the jury instructions *Page 221 
in two segments — one segment preceded the closing arguments of the attorneys and the other segment followed the closing arguments.[4] The trial court began the first segment by instructing the jury that the statements of counsel were not evidence. He then stated:
 "Michael Jeffrey Land, the defendant in the case, is presumed to be not guilty. The lawyers talked with you about that. I think a couple of jurors perhaps in the group were asked specific questions about it, I'm not sure.
 "He is presumed to be not guilty. No burden of proof rests on Michael Jeffrey Land here in the litigation. The burden of persuasion, the burden of going forward with the evidence is on the State of Alabama, the prosecuting governmental entity.
 "The fact that Mr. Land is here as the defendant, he enjoys the presumption of innocence, that's evidence in his behalf. That is evidence in his behalf here in the case.
 "What does the State have to do in order to overcome or override the presumption of innocence that Michael Jeffrey Land enjoys? The State has to bring you strong and cogent evidence that convinces you people beyond a reasonable doubt of his guilt in order to overcome the presumption of innocence." R. 1902-03.
The court then explained the State's burden of proof, defined reasonable doubt, and instructed the jury that the indictment was not evidence or an indication of guilt. The trial judge informed the jury that it was the "sole and exclusive judge of the weight and sufficiency of the evidence," R. 1909-10, and gave instructions regarding the credibility of witnesses.
At this point, the court again instructed the jury on the State's burden of proof and reasonable doubt, then stated:
 "The presumption of innocence that we have discussed at length here is to be regarded by you people as a matter of evidence, as I said, to the benefit of which Michael Jeffrey Land here is entitled. And as a matter of evidence, it attends Michael Jeffrey Land throughout the course of the litigation until his guilt is by the evidence placed beyond a reasonable doubt."
R. 1917. The trial judge then instructed the jury on direct and circumstantial evidence. He concluded the first segment of instructions with brief descriptions of the charges contained in the indictment and of the lesser offenses included in those charges.
After the attorneys made their closing arguments, the trial court gave the second, and final, segment of the jury instructions. In this segment, the trial court instructed the jury on the elements of the capital offenses charged in the indictment — intentional murder during the course of a burglary and intentional murder during the course of a kidnapping — and on the lesser offenses included within each charge — felony murder, intentional murder, and first and second degree burglary and felony murder and intentional murder, respectively. With regard to each of the charged offenses and the lesser offenses included within each charge, the trial court repeatedly stated that, in order to convict the appellant, the jury must be convinced of his guilt beyond a reasonable doubt.
The trial judge then instructed the jury that its verdict must be unanimous and that the jury would be polled when it returned the verdict. After mentioning the verdict forms and briefly explaining the role of the foreperson, the trial court stated: *Page 222 
 "Don't forget some of the preliminaries: Presumption of innocence that attends Mr. Land, he is presumed to be not guilty. The burden of proof is on the State, it does not shift to the defendant at any point in the litigation. The State having to prove guilt beyond a reasonable doubt, we talked at length about that."
R. 2050-51 (emphasis added). The trial judge reminded the jury that he had previously instructed it with regard to the credibility of witnesses and circumstantial evidence. The judge then concluded by reiterating:
 "[T]he State's burden is to always establish beyond a reasonable doubt each of the elements of the offenses charged, including the involvement of the defendant. The burden of proof does not shift to a defendant who asserts through his witnesses that he was elsewhere at the time and occasion of the events complained of."
R. 2053-54.
The appellant contends that he was prejudiced by the trial court's "order and manner of giving the charge" in that "the two parts [of the charge were] . . . divided so that the part of the charge that favor[ed] the defendant [wa]s given at the first part of the charge," while in the last part of the charge, which was given after the closing arguments, "the phrase 'not guilty' [wa]s used [only] four times." Appellant's brief at 107. This claim is without merit.
Rule 21.1, A.R.Crim.P., provides, in pertinent part: "The court shall inform counsel of its proposed action upon [any written] requests [for jury instructions] prior to their arguments to the jury, but the court shall instruct the juryafter the arguments are completed." (Emphasis added.) By giving one segment of the jury instructions before the closing arguments, the trial judge in this case violated the letter of Rule 21.1. However, he did so with the express consent of defense counsel. More importantly, the appellant was not prejudiced by this action.
This Court must review the jury instructions given by a trial court as a whole. Beard v. State, 612 So.2d 1335, 1344
(Ala.Cr.App. 1992); Williams v. State, 611 So.2d 1119, 1123
(Ala.Cr.App. 1992). The instructions in this case, when considered as a whole, accurately stated the principles of law and the issues involved. In the first segment of these instructions, the trial court clearly and adequately covered the presumption of innocence. See, e.g., Grace v. State,456 So.2d 862, 864 (Ala.Cr.App. 1984); Brooks v. State,380 So.2d 1012, 1014 (Ala.Cr.App. 1980). Near the end of the second segment, the trial court again reminded the jury that the appellant was presumed innocent. Throughout both segments, the court stressed to the jury that the State had the burden of proof. The instructions as a whole were both fair and accurate.
 XII
In his last issue, the appellant appears to be complaining generally of the prosecutor's entire opening argument. He maintains that the argument was delivered in a manner "calculated to mislead and confuse the jurors with regard to what information was factual and what information was the prosecutor's own personal opinion." Appellant's brief at 102. At trial, however, there were two specific objections made during the prosecutor's opening argument. The first was made when the prosecutor said that the victim's landlord "knew the [victim's] phone line previously had been cut, but they had in fact been repaired."[5] R. 679. The second objection was made when the prosecutor began to discuss the appellant's statements to police officers.[6] Neither of these objections are pursued on appeal. *Page 223 
Because this is a case in which the death penalty has been imposed, the fact that no objection was made stating the particular ground asserted on appeal does not prevent our review of this issue. Ex parte Hart, 612 So.2d 536, 537 (Ala. 1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450,124 L.Ed.2d 666 (1993). However, the failure to object
 " 'does weigh against any claim of prejudice.' Ex parte Kennedy, 472 So.2d [1106, 1111 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325
(1985)]. 'This court has concluded that the failure to object to [allegedly] improper prosecutorial arguments . . . should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.' Johnson v. Wainwright, 778 F.2d 623, 629
n. 6 (11th Cir. 1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987)."
Kuenzel v. State, 577 So.2d at 489 (emphasis original in Exparte Kennedy).
It is well recognized that, in his opening statement, "a prosecutor may properly explain to the jury what he expects the evidence to show." Funches v. State, 518 So.2d 781, 786
(Ala.Cr.App. 1987). While the prosecutor may not make a statement to the effect that he has knowledge that the defendant is guilty of the charged offense, Galloway v. State,484 So.2d 1199, 1200 (Ala.Cr.App. 1986), he "is to be allowed considerable latitude in presenting to the jury in his opening statement what he expects the evidence to show," Ladd v. State,489 So.2d 708, 710 (Ala.Cr.App. 1986). We have examined the entire opening statement of the prosecutor in this case and we find it to be nothing more than a permissible explanation of what the prosecutor expected the evidence to show. We note that, before opening statements were made, the trial court informed the jury that the attorneys would be "given a brief opportunity to address you and state to you what they expect the evidence to be in the case." R. 674. The trial court had also instructed the jury that "[w]hat the lawyers say is not evidence, has no evidentiary value." R. 666.
 XIII
Pursuant to Rule 45A, A.R.App.P., this court has searched the record for any plain error or defect in the proceedings against the appellant. We have found no error that either has or probably has adversely affected the substantial rights of the appellant. Pursuant to Ala. Code 1975, § 13A-5-53(a), we have reviewed the propriety of the death sentence and have determined that no error adversely affecting any right of the appellant occurred at either the guilt or sentence phase of the proceedings.
The trial court found the existence of two aggravating circumstances: "that the capital offenses were committed while the defendant was engaged . . . in the commission of . . . burglary [and] kidnapping." Ala. Code 1975, § 13A-5-49(4).
In accordance with Ala. Code 1975, §§ 13A-5-51 and -52, the trial court considered the evidence presented at both the guilt and the penalty proceedings, the aspects of the presentence report favorable to the appellant, a discharge summary from Hillcrest Hospital where the appellant was formerly a patient, the findings of Dr. C.J. Rosecrans, a certified forensic examiner who interviewed the appellant after his indictment, and letters submitted to the court from the appellant's family members. After reviewing of all these items, the court concluded that there were no mitigating circumstances. The court determined that the two aggravating circumstances, when weighed against the absence of any mitigating circumstances, compelled it to concur with the jury's advisory verdict of death.
The trial court's findings concerning the aggravating and mitigating circumstances are supported by the evidence, and death is the proper sentence in this case. Our search of the record reveals no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. Our independent weighing *Page 224 
of the aggravating and mitigating circumstances indicates that death is the proper sentence. We find that the sentence of death in this case is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. The appellant was convicted of the offenses of murder committed during a burglary in the first degree and murder committed during a kidnapping in the first degree, both capital offenses by statutory definition. Ala. Code 1975, § 13A-5-40(a)(1) and (4). We note that similar crimes are being punished capitally throughout this state. See Stewart v.State, 659 So.2d 120 (Ala.Cr.App. 1992), affirmed as to conviction, reversed as to sentence, with new sentencing proceeding ordered 659 So.2d 122 (Ala. 1993) (murder/burglary and murder/kidnapping). See also Thomas v. State, 539 So.2d 375
(Ala.Cr.App.), affirmed, 539 So.2d 399 (Ala. 1988), cert. denied, 491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 709 (1989) (murder/burglary); Lynn v. State, 543 So.2d 704 (Ala.Cr.App. 1987), affirmed, 543 So.2d 709 (Ala. 1988), cert. denied,493 U.S. 945, 110 S.Ct. 351, 107 L.Ed.2d 338 (1989) (murder/burglary); Ford v. State, 515 So.2d 34 (Ala.Cr.App. 1986), affirmed, 515 So.2d 48 (Ala. 1987), cert. denied,484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1023 (1988) (murder/burglary); Thompson v. State, 542 So.2d 1286
(Ala.Cr.App. 1988), affirmed, 542 So.2d 1300 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989) (murder/kidnapping); Neelley v. State, 494 So.2d 669
(Ala.Cr.App. 1985), affirmed, 494 So.2d 697 (Ala. 1986), cert. denied, 480 U.S. 926, 107 S.Ct. 1389, 94 L.Ed.2d 702 (1987) (murder/kidnapping); Heath v. State, 455 So.2d 898 (Ala.Cr.App. 1983), affirmed, 455 So.2d 905 (Ala. 1984), affirmed,474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985) (murder/kidnapping).
The judgment of the circuit court convicting the appellant of the offenses charged in the indictment and sentencing him to death is affirmed.
AFFIRMED.
All Judges concur.
[1] Evidence of this admission, as well as evidence of the fact that Ms. Brown's house had previously been burglarized, was not presented to the jury.
[2] That information was not presented to the jury.
[3] We note that this is the first request for a mistrial with regard to State's Exhibit 43.
[4] When the defense rested, the trial court asked the prosecutor if he had any rebuttal. The prosecutor responded, "No, sir." R. 1894. The following then occurred:
 "THE COURT: Do we understand that I'll go first, is that all right with you guys, in my comments to the jury?
"MR. MATHIS [defense counsel]: Yes, sir.
 "THE COURT: I'll bring it up to the charges and I'll be the first to tell them about the lesser offenses and then I'll turn it over to you fellows and I'll conclude with the charges and a rehash of what I first gave them.
"MR. DODD [defense counsel]: Yes, sir.
". . . .
 "THE COURT: Mike [Anderton, the prosecutor], is that all right with you?
"MR. ANDERTON: Yes, sir." R. 1894-95.
[5] As we have noted elsewhere in this opinion, the victim's house had been previously burglarized and the appellant admitted committing the earlier burglary; however, this information was not presented to the jury.
[6] "MR. MATHIS [defense counsel]: Judge, at this point I am going to object to going into detail about any statement that may or may not have been made and ask that the district attorney be instructed not to go into that and let that come out in evidence if it can come out in evidence.
"THE COURT: We pretried that issue, Erskine.
 "MR. MATHIS: I realize that, Your Honor. However, I think we still are entitled to make an objection when that comes up at this point and try it and litigate it again. And because of that, I would move he be instructed not to go into it at this time.
"THE COURT: Overruled, sir." R.682-83.