678 So.2d 224 (1996)
Ex parte Michael Jeffrey LAND.
(In re Michael Jeffrey Land v. State).
1940896.
Supreme Court of Alabama.
March 1, 1996.
Opinion Overruling Application for Rehearing May 17, 1996.
*228 Joseph T. Flood, Rochester, NY, for petitioner.
Jeff Sessions, Atty. Gen., and Beth Slate Poe, Asst. Atty. Gen., for Respondent.
BUTTS, Justice.
Michael Jeffrey Land was convicted of the capital murder of Candace Brown, and the trial judge sentenced him to death, following the jury's recommendation of that sentence. The Court of Criminal Appeals affirmed both his conviction and his death sentence. Land v. State, 678 So.2d 201 (Ala.Cr.App.1995). On certiorari review, we affirm the judgment of the Court of Criminal Appeals.
On the evening of May 18, 1992, Candace Brown drove to her mother's home to pick up her two-year-old son. Because Ms. Brown's residence had been burglarized five days earlier, her mother and brother followed her home to make sure the house was safe. Ms. Brown's mother and brother left the house at approximately 9:00 p.m.
The following morning, May 19, Ms. Brown's landlord went to her residence to supervise the installation of a fence. The landlord observed that a window located near the rear entry to the house had been broken into, that the telephone wires to the house had been cut, and that the window on the driver's side of Ms. Brown's car had been shattered. After knocking on the front door and receiving no response, the landlord asked a neighbor to call the police and then returned to his own home in order to get a spare set of keys to Ms. Brown's house.
When officers from the Birmingham Police Department arrived at Ms. Brown's residence, they established that all doors to the house were locked, that a storm window located near a rear entry to the house had been removed, and that several panes of the interior window behind that storm window had been cut and removed. They saw on one of the removed panes of glass, which was lying on the ground, a shoe imprint with a distinctive tread design bearing the lettering "USA."
The landlord opened the house for the police officers, who found Ms. Brown's infant son alone and unharmed. The officers also found on a bulletin board a note with the name and telephone numbers of Michael Jeffrey Land and his mother, Gail M. Land.
After telephoning Ms. Land and learning from her where her son Jeffrey was working, Detectives Steve Corvin and Larry Fowler went to Riverchase Galleria, a shopping mall in Hoover, where Jeffrey Land was repairing the roof of the mall. The detectives informed Land that they were investigating the disappearance of Ms. Brown, and he agreed to accompany them to the police station to answer some questions. He was taken to an interrogation room and informed of his rights, pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He signed a waiver of rights form and agreed to have his statement tape-recorded.
Land acknowledged in the tape-recorded statement that he knew Ms. Brown, but said that he had not seen her in about a week, that he had no idea where she was, and that he had no knowledge about the most recent break-in at her residence. However, Land later confessed that he had burglarized Ms. Brown's residence six days earlier and that during the course of that burglary he had cut the exterior telephone lines.
*229 When the detectives inquired as to where he had been the night before, i.e., May 18, Land claimed that he had been visiting a girlfriend at her parents' apartment until approximately 11:30 p.m. Land said that after he left the apartment he fell asleep in his car in the parking lot at the apartments and that he awoke at approximately 4:15 a.m., May 19, and drove to his grandfather's house; he said he lived there with his grandfather. Land claimed that he reported to work at the Galleria before 6:00 a.m. that morning, that he had eaten lunch earlier that day with a second girlfriend, and that his car was parked at that second girlfriend's house.
During the interrogation, Detective Fowler noticed that the tread design on the bottom of Land's tennis shoes appeared to match the print the officers had seen on the window glass at Ms. Brown's house. At the completion of Land's interview, Detective Fowler asked to see Land's shoes and, upon closer observation, noticed what appeared to be bloodstains. The detectives asked Land to removes his shoes and clothes, and they gave him a jail uniform to wear.[1] Meanwhile, Birmingham Police Lieutenant Carl Quinn telephoned Land's second girlfriend, who denied having eaten lunch with him that day and also stated that Land's car was not parked at her home.
After Lt. Quinn relayed that information to Detectives Fowler and Corvin, Corvin informed Land that his second girlfriend had denied eating lunch with him and had denied having his car. Detective Corvin then told Land that he needed to tell the truth about the disappearance of Ms. Brown. Confronted with this discrepancy in his statement, Land then agreed to make a second statement, but refused to allow it to be tape-recorded.
Once again, Land was informed of, and waived, his Miranda rights. In his second statement, Land stated that he had met two men, whom he named "Tony" and "Edward," at a gas station late the previous night and that these men had asked him if he knew an "easy mark" for a burglary. Land stated that he suggested Ms. Brown's house and that Tony and Edward had paid him $20 to cut and remove the glass to a window in Ms. Brown's house. Land said that the three of them entered the kitchen through this window.
Land said that after they entered the house Ms. Brown walked into the kitchen, where the three men were, and that either Tony or Edward slapped her, knocking her to the floor and causing her nose and mouth to bleed. According to Land, as Ms. Brown fell, she grabbed his hand and, he said, in doing so she may have gotten some blood on his gloves. When Detective Corvin told Land that no trace of blood was found in Ms. Brown's house, Land said that either Tony or Edward had cleaned the blood up with paper towels and then had placed the towels in his pants pocket. Land said that after Ms. Brown was injured he became frightened and left the house and that he did not know what happened to her after that.
In this second interview, Land admitted that his car was not parked at a girlfriend's house, but was instead parked in the parking deck at the mall where he had been working. When told by Detective Corvin that the police would need to look in his car, Land asked what would happen if they found something in his car that he was not supposed to have. Detective Corvin told Land that they were looking for evidence concerning Ms. Brown's disappearance and asked Land if he was referring to drugs. Land answered that he had a .45 caliber automatic handgun in his car and would consent to a search of the car only if the police agreed not to charge him with carrying a gun. Without agreeing to Land's conditions, Detective Corvin asked Land for his car keys. Land handed the keys to the detective.
Detective Fowler located Land's car, opened the trunk, and made a visual inventory of the trunk, without moving or touching the contents. He saw a .45 caliber semi-automatic handgun in the trunk, but did not seize it. Instead, the police had the car towed to a secure lot; it was searched two days later pursuant to a valid search warrant.
*230 On the evening of May 19, after completing his second statement, Land was informed that he was under arrest. The next day, May 20, Ms. Brown's body was discovered by hikers in a rock quarry on Ruffner Mountain in Jefferson County. She had been shot once in the back of her head. Land was charged with capital murder.
At trial, the State's expert testimony showed that a pair of wire cutters found during the search of Land's car had made the cuts on the telephone wire leading into Ms. Brown's residence; that two types of glass fragments found on a pair of gloves seized from Land's car were consistent with the glass in the shattered window of Ms. Brown's car and with the glass in the broken window near the rear entry of Ms. Brown's house; that Land's tennis shoe sole had the same distinctive design as the shoe print found on a removed pane of glass at Ms. Brown's house; that the bullet recovered from Ms. Brown's head had been fired from a .45 caliber handgun and that it matched a bullet test-fired from the .45 caliber handgun found in Land's car; and that a DNA profile of a semen stain found on Ms. Brown's blouse matched Land's known blood sample, and that only one in 20,620,000 white males would have those same DNA characteristics (Land is white).
Land was convicted of two counts of capital murder for the death of Ms. Brown. The jury found him guilty of murder during a burglary, Ala.Code 1975, § 13A-5-40(a)(4), and guilty of murder during a kidnapping, Ala.Code 1975, § 13A-5-40(a)(1). By a vote of 11-1, the jury recommended that he be sentenced to death. The trial court followed the jury's recommendation and sentenced Land to die in the electric chair.
Land has raised for this Court's review 23 issues, some of which were also raised before the Court of Criminal Appeals and discussed in that court's lengthy opinion. We have thoroughly reviewed the issues raised before the Court of Criminal Appeals, and we find no error in the opinion of that court. We have also thoroughly reviewed the additional issues Land has raised for the first time before this Court and have found no reversible error. Moreover, we have carefully reviewed the record for "plain error," in accordance with Rule 39(k), Ala.R.App.P., and have found none. We discuss here the issues that Land did not raise before the Court of Criminal Appeals, and also 2 issues that were raised in that court, but which Land's appellate counsel emphasized in oral argument before this Court.

I.
At oral argument, Land argued, through counsel, that his conviction should be reversed and that he should be given a new trial because, he says, the prosecutor impermissibly commented to the jury regarding his failure to testify. The prosecutor's comments he complains of were made during rebuttal closing argument of the guilt phase of the trial.
In the prosecutor's argument, the court reporter did not provide quotation marks on those portions of the prosecutor's statement that were obviously intended as representations of what various persons had said. In our quotation of the prosecutor's argument here, we have added those quotation marks. The prosecutor stated:
"They arrested him, ladies and gentlemen, for murder. They arrested him following his statement to the Birmingham Police Department: `I wasn't there, I didn't have anything to do with it. I don't know what you're talking about. I was at my girlfriend's house, my car was out at Marie F.'s.
"They take his shoes. They call Marie, they come back and say, `Hey, Jeff, Marie ain't got your car. And your shoes match the shoeprint out there on the scene. What you got to say? Tell us the truth.'
"`Well, I'll talk to you, but not if that thing's running. I'll talk to you, I don't want it recorded like that. I'll tell you what happened.'
"So, then the defense wants you to believe that we have so intimidated this man [that] he is going to confess to breaking in a house that we haven't even told him anything about. He talks to you about how he went in the window. That was known at 8:30 in the morning. How he *231 broke the glass to go in that window. It's broken, it's stacked up.
"How he was wearing the same clothes that he's got on right now. That matches the footprint out on the scene [sic].
"How he went inside, committed the burglary. They wanted to commit a burglary. What do you do during a burglary? You steal. You steal.
"He gets inside with these two fictional human beings, I guess, and he gets scared and leaves because he realizes he is in some deep trouble. He has got to get out of this thing somehow. He ain't about to admit to committing the killing, so he is going to lay it off on Tony and Edward. `Oh, I got scared and left. And I had my car and I drove home and I went overI went on to work.' That means he has got his car the entire time. And where do we find the gun that fires the bullet into Candy Brown's head? We find it in the trunk of his automobile at 4:00 o'clock that afternoon. And he's got the keys until such time [as] the Birmingham Police Department takes them from him. He's got the keys.
"There was a bullet found inside that house by the front door. It is consistent with having been fired out of this gun. Remember that.
"Of course, Mr. Land, even in the statement where he talks to the police, starts hedging his bets and covering his tail a little bit. Said, `Oh, I got scared after she got hit by Tony and Edward and there was blood everywhere and that's how it got on my handson my gloves and on my pants.'
"`Phyllis Rollan, did you go out there and luminol that place?' `Yep, no blood.'
"Jeff tell us the truth, tell us the truth. [Because Land questions whether these words were the prosecutor's own words or were part of the prosecutor's summary of other persons' statements, we have not added the quotation marks that have been added on other sentences or phrases.]
"Ladies and gentlemen, the Birmingham Police Department did not conspire against Jeffrey Land. I don't care about this guy unless or until he breaks the law here in the state of Alabama. And that's what he has done in this case. He committed a burglary and during that burglary he fired in that house. And then he marched Candy Brown up to Ruffner Mountain and he tried to blow her brains out. Now, you tell me, is a shot to the back of the head with a.45, is that an intent to kill?
". . . .
"He is wearing gloves. He goes in and at some point Candy Brown wakes up and he says, `You're going with me.' She said, `I'm not going anywhere.' Maybe she ran towards the front door, maybe she was trying to get out. But at one point Michael Jeffrey Land fires the gun and said, `The next one's for the kid. You're going with me.'
". . . .
"And he tells her to lie down. `Lie down.' ...
"... He stands above her, bang, right in the back of the head.
". . . .
"And he had the gall, gosh, the gall to be wearing the same clothes that he had just blown her brains out with. He didn't even go home and take a bath. He didn't go home and change clothes to get out of these death clothes, if you will. He didn't think nobody was going to find her. But Candy Brown knew somebody would find Michael, the little boy.
". . . .
"But this man right here, ladies and gentlemen, he stands before you and says, `They lied, those people lied, I don't know anything about a footprint nor a statement saying I was there.' Through his attorneys he continues to say `I don't know anything about the wire cutters or the phone lines or the glass fragments, I don't know anything about the gun or how that bullet got into her head. It may not even be the right bullet. And if it is, David Higgins is so dumb he can't read it.' That's how with utter and total degradation of the Birmingham Police Department, Department of Forensic Sciences, Coroner's Office [sic].
"No Birmingham police officer, with what they go through day in and day out, *232 should have to put up with the accusations that were put forth in this room. No Department of Forensic Sciences personnel should have to put up with those kinds of accusations, but they have to, part of their job."

A.
Land argues that the first emphasized statement in this quotation of the prosecutor's argument beckoned Land to tell the truth and that the statement was a direct comment by the prosecutor on Land's right not to testify. He argues that, at a minimum, the jury could have understood this statement to be a comment upon Land's failure to testify. He argues that the second emphasized statement of the prosecutor was a comment on Land's failure to testify because, he argues, it suggests that through his attorneys Land could continue to lie without taking the stand.
Further, Land contends that the second comment adversely colors the first because, he says, it demonstrates that with the first comment the prosecutor was not referring to Land's recorded statement. Rather, Land argues, the prosecutor was highlighting the fact that Land did not testify and was suggesting that he was lying to the jury though his attorneys and was thereby inviting the jury to infer that Land was guilty. Finally, Land argues that because the prosecutor made two separate comments regarding Land's silence, it increased the probability that the jury would understand the remarks to constitute a comment on Land's failure to testify.
In response, the State contends that when the first emphasized comment is viewed in the context of this particular trial and in light of the full text of the prosecutor's closing argument, it is clear that the prosecutor was referring to the confession given by Land, which was part of the evidence at trial. In other words, the State argues that the remark was not a comment on Land's failure to testify, but was instead a comment on Land's failure to tell the truth in his statement to the police. The State argues that the second statement at issue was merely a continuation of the first and was a permissible reply-in-kind argument directed to defense counsel's earlier statements.

B.
In Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), the United States Supreme Court held that a state prosecutor's direct comment on an accused's failure to testify violates the accused's rights under the Fifth and Fourteenth Amendments to the United States Constitution. Under this standard, "a statement by a prosecutor is improper if it was manifestly intended to be, or was of such a character that the jury would naturally and necessarily take it to be, a comment on the failure of the accused to testify." Marsden v. Moore, 847 F.2d 1536, 1547 (11th Cir.), cert. denied, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988). This Court has also ruled that "where there is the possibility that a prosecutor's comment could be understood by the jury as a reference to failure of defendant to testify, § 6 [Alabama Constitution of 1901] is violated." Beecher v. State, 294 Ala. 674, 682, 320 So.2d 727, 734 (1975).
As noted by the State, Land failed to object to either of these comments and, thus, failed to preserve for appellate review the issues he now raises. However, because this is a case where the death penalty has been imposed, this Court will, pursuant to Rule 39(k), Ala.R.App.P., notice any "plain error," regardless of whether an objection was made before the trial court. Plain error is error that "has or probably has adversely affected the substantial rights of the petitioner." Rule 39(k). "In other words, the plain-error exception to the contemporaneous objection rule is to be `used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985), quoting United States v. Frady, 456 U.S. 152, 163, n. 14, 102 S.Ct. 1584, 1592, n. 14, 71 L.Ed.2d 816 (1982).
We further note that "[w]hen an accused contends that a prosecutor has made improper comments during a closing argument, the statements at issue must be viewed in the context of the evidence presented in the case and the entire closing argument made to the juryboth defense counsel's and *233 the prosecutor's." Ex parte Musgrove, 638 So.2d 1360, 1368 (Ala.1993), cert. denied, Rogers v. Alabama, ___ U.S. ___, 115 S.Ct. 136, 130 L.Ed.2d 78 (1994).
1. "Jeff tell us the truth, tell us the truth."
The Court of Criminal Appeals addressed the issue whether the prosecutor's use of these words violated Land's constitutional rights, and that court found no error, plain or otherwise. That court held there was no chance that the jury could have understood the comment to be a reference to Land's failure to testify. Land, 678 So.2d at 218.
We agree. In the first part of the prosecutor's rebuttal closing, he simply quoted or paraphrased statements Land had made to the police and statements the police had made to Land while he was being interrogated. It is clear that the prosecutor's discourse was nothing more than a "story" of the evidence told to the jury by the prosecutor's switching back and forth, speaking as Land, as the police, as a witness, and as the prosecutor himself.
The Court of Criminal Appeals correctly held that "the remark was not a comment on the appellant's failure to testify, but a comment on the appellant's failure to tell the truth in his statement to the police." Land, 678 So.2d at 217. In the context of the prosecutor's entire closing statement, the jury could not have construed the words "Jeff tell us the truth, tell us the truth," to be anything other than a narration of what the police had said to Land when his initial statement conflicted with known facts. There was no error in the prosecutor's use of those words.
2. "Through his attorneys he continues to say `I don't know anything about the wire cutters or the phone lines or the glass fragments, I don't know anything about the gun or how that bullet got into her head.'"

"These words, also part of the prosecutor's rebuttal closing argument, followed his discussion of various statements that Land's counsel had made during closing argument. Land's counsel had attacked the credibility of the evidence presented by the State's expert witnesses, including testimony regarding the tennis-shoe "footprint" similar to Land's found on a pane of glass, the procedure used to compare the cut made by Land's wire cutters to the cut made on the telephone wire, the procedures used to analyze evidence for a blood type and DNA match, the match of a bullet fired from Land's gun to the bullet retrieved from the victim's body, and the match of two types of glass found on Land's gloves with the window glass in the victim's car and house.
We disapprove of a statement by a prosecutor referring the jury to the fact that the defendant spoke through his attorneys, i.e., that he did not speak for himself. Thus, if Land's counsel had made a contemporaneous objection to this statement, and we were to apply the Beecher standard explained above, we might have held the comment to be reversible error. This is true even though it is clear to this Court that, when viewed in the context of the confrontational nature of closing arguments, the prosecutor's comment was intended as a "reply in kind" to the argument made by Land's counsel.
However, the comment was not objected to during trial. Thus, the statement may be considered only by the standard of the plain error rule. Under that standard, given the evidence presented in this case, we find no plain error in the prosecutor's statement.[2]

II.
Land argues that his rights guaranteed under the Fifth, Sixth, Eighth, and Fourteen Amendments to the United States Constitution, and similar rights guaranteed under Alabama law, were violated when, he says, *234 the trial court failed to correct what he calls a juror's misunderstanding about the presumption of innocence and the juror's responsibility for recommending a punishment. At the close of the guilt phase of the trial, the judge informed both defense counsel and the prosecution that he had received an anonymous note from the jury during defense counsel's closing argument.
The trial court informed the attorneys for both sides that it had decided that Juror C. had written the note. Defense counsel agreed to have Juror C. removed from the panel and replaced by alternate Juror S.
"[JUDGE HARD]: Let me get this on the record about the alternates. Let me tell you what my proposal is. We had Walter, you don't know yetwe had, as the jury exited for a break before Erskine [Mathis] argued, Andy Willis, the bailiff, handed me a yellow paper that will become your property, I read this to the fellows before Erskine [Mathis] argued. We have divined that Ms. C. wrote this note, the lady that had been a victim and wanted to talk privately, isn't that Ms. C., the one with the hat? That's Ms. C. She wrote the note.
"I have the law here, the rules of procedure that tell me, in blue highlight, if anybody wants to read it, the last person struck shall be the alternate and if it becomes necessary for an alternate to replace a principal juror, then the last person struck shall be so designated as such. So, I can say to you guys that your last strike was 289, [Juror S.] Is that the blonde on the left? Does anybody know?
"[MR. MATHIS (defense counsel)]: I would state for the record that the lady who wrote the note has glared at us ever since we found out about the note, as though she would like to spit. I have been particularly cognizant of that. While I was standing up there within two feet of her trying to give my closing argument, I was really worried
"[JUDGE HARD]: Well, do you want her to be struck?
"[MR. MATHIS]: I think that is our client's decision and, of course, mine and Hiram [Dodd's] as well.
"[MR. DODD (defense counsel)]: I think the client needs to hear what she said.
"[THE COURT]: Here's what she said: `I object to Mr. Dodd's statement about them wanting us to kill him. I feel he did it to play on our guilt. Whatever the verdict may be we are not responsible for the punishment of the defendant if found guilty, the defendant is. If I may object.' It is signed `juror.'
"I show it to you. Give it to Walter when you are through with it.
"[MR. MATHIS]: I want to exercise my discretion
"[MR. DODD]: You have observed her more than I have
"[MR. MATHIS]: I have serious misgivings about leaving her on the jury, in light of the appearance of things.
"[MR. LAND (defendant)]: Did y'all just get the note today?
"[MR. MATHIS]: Yeah.
"[MR. DODD]: Just now.
"[MR. LAND]: She's been glaring before today.
"[MR. DODD]: All right. Don't say anything else.
"[JUDGE HARD]: All right.
"[MR. MATHIS]: We would like to have her excluded, Judge.
"[MR. DODD]: And whoever is supposed to be put in there, put them in."
Land now points out that although the note was signed "juror," it included the plural terms "us," "our," and "we," and he argues that this fact suggests that its contents actually represented the view of the jury as a whole. Land contends that the text of the note evidences a misunderstandingthat the jury is not responsible for recommending a punishmentand also suggests that the jury may have prematurely concluded that he was guilty. Land now asserts that, at a minimum, the trial court was obligated to poll the jury or to allow defense counsel an opportunity to ascertain whether there existed juror bias.
In response, the State argues that there was no error, because, it says, the trial court *235 properly instructed the jury on the presumption of innocence, the reasonable doubt standard, and the jury's role in sentencing, and the State says the judge alleviated any possible prejudice to Land by replacing Juror C. with an alternate. The State contends that Land's argument based on the use of the plurals "we" and "us" is unfounded because the note was signed with the singular noun "juror." It also argues that Land presented no proof that the note represented the feelings of more than the one juror that was replaced.
We find no error in the actions of the trial court. A trial court has considerable discretion in determining the scope of the inquiry required when there is an irregularity involving a juror or the jury. See Johnson v. State, 620 So.2d 679 (Ala.Cr.App.1992), reversed on other grounds, 620 So.2d 709 (Ala.1992), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993), and Sistrunk v. State, 596 So.2d 644 (Ala.Cr.App. 1992). The record reveals that there was no doubt in the minds of the trial judge, the prosecutors, defense counsel, or the defendant that Juror C. had written the note. Not only did Land's counsel not object to the trial court's actions, they specifically requested that the judge, to remedy the problem, only replace Juror C. Moreover, because Land did not object to the trial court's action, this issue is reviewable only under the plain error standard. Clearly, the trial court did not commit plain error.

III.
Land argues that his rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and similar rights guaranteed by Alabama law, were violated when, he says, the prosecutor used prejudicial victim impact evidence during the guilt phase of the trial. Before trial, Land's counsel asked the court to prohibit the State from introducing evidence regarding the condition in which the police found Ms. Brown's two-year-old son following her disappearance. The grounds for this motion was the argument that that evidence would likely inflame the emotions of the jury. The trial court reserved its ruling on the motion until trial, but after the trial began it never ruled on the motion.
According to Land, the prosecution learned during voir dire examination of prospective jurors that those prospective jurors who had some memory of news media accounts of Ms. Brown's murder recalled that her infant son had been with her in the house. Land argues that during opening statements the prosecutor then focused on Ms. Brown's infant son by suggesting that he was the last person to see his mother alive and by informing the jury that he had been left alone in the house when his mother was abducted from the house. Land argues that during the guilt phase of the trial the prosecutor elicited references to the child from several witnesses, and that in closing statements he emphasized the suggestion that Ms. Brown had sacrificed her life to keep her son alive.
Land also contends that the prosecutor improperly introduced evidence regarding the impact Ms. Brown's death had upon her family and then, during closing arguments, commented several times on the family's loss. Land contends that this evidence should have been excluded because, he says, its prejudicial effect far outweighed any probative value it may have had.
In response, the State argues that there was no error in the prosecution's questioning of those prospective jurors that remembered the crime, and that any questioning regarding the presence of the victim's son was not for the purpose of gathering victim impact evidence, but was merely a part of the general questioning of the venirepersons to ascertain whether any of them had prior knowledge and fixed opinions about the case. The State argues that the prosecution's opening statement telling the jury about the fact that the child had been left alone in the house was not improper because that was a fact the prosecutor expected the evidence would show, or, the State says, was a crucial part of the res gestae or chain of events in Ms. Brown's death. Further, the State contends that any questioning of witnesses regarding the child was not improper or was at most merely harmless error. The State argues that any mention of the victim's child by the *236 prosecution during closing arguments of the guilt phase was to state a legitimate inference derived from the evidence and was, therefore, proper. Again, the State argues that, at most, the comments about the child were harmless error. The State also says that Land did not object to any references to the child during opening arguments, questioning of witnesses, or closing arguments.
The State argues that any comment or questioning by the prosecution regarding the effect of Ms. Brown's death on her family did not have an impact on the fairness of Land's trial. It also says that Land did not object to the comments or questioning. The State contends that, at most, the prosecution's action was only harmless error.
Recently, this Court examined the issue of victim impact evidence in Ex parte Rieber, [Ms. 1940271, May 19, 1995] 663 So.2d 999 (Ala.1995). In Rieber, we acknowledged that testimony regarding a murder victim's children was not relevant to the issue of the accused's guilt or innocence and was, thus, inadmissible during the guilt phase of trial; we noted, however, that "a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant." 663 So.2d at 1005. After thoroughly reviewing the record of this present case, we conclude that the limited testimony regarding Ms. Brown's infant son and the impact of Ms. Brown's death on her family, and the prosecution's limited references to such evidence, did not operate to deny Land a fair trial or to prejudice his substantial rights. Thus, we find no reversible error as to this issue.

IV.
Relying on Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), Land argued to this Court at oral argument that he should receive a new sentencing hearing because the trial judge stated that he had read and considered several letters written to him by the victim's family and friends. Land contends that the letters, which expressed the writers' opinions regarding Land, the crime, and the appropriate punishment, prejudiced the judge against him, prevented him from receiving a fair sentencing hearing, and violated his Eighth Amendment rights.
In response, the State agrees that the law prohibits a trial court from considering victim impact evidence regarding characterizations of the defendant, the crime, or appropriate punishment. However, the State's position is that although the trial judge did read the letters that are now at issue, he did not improperly "consider" them during the process of determining Land's sentence. The State asserts that the trial judge was an experienced judge and was well aware of the law regarding what factors he could consider in determining Land's sentence and was capable of sorting out and using only the information he could properly consider under the law.
Because Land failed to make a contemporaneous objection during his sentencing hearing when the trial judge stated that he had read the letters from Ms. Brown's family and friends, we review this issue under the plain error standard.
The trial judge stated the following during the sentencing hearing:
"[JUDGE HARD]: I have also received, as you know, additional correspondence from family members, both [members of the] Brown family and [members of the] Land family. I would like to thank each person who has written me from both sides for the heartfelt sentiments that you have forwarded to me, many of you. I appreciate it. Many of the comments were very disturbing, but I thought very carefully about everything that's been written to me by every person. Of necessity, I copied everything and gave it to the lawyers and Mr. Land.
". . . .
"[JUDGE HARD]: All right. Proceeding to the determination of sentence, as we know, we lawyers know that I am to determine sentence based squarely on whether or not prevailing [sic] circumstances *237 found to exist outweigh mitigating circumstances found to exist. I am to consider the jury's recommendation contained in their advisory verdict, though, as we all understand, we are in a jury-override state and the jury's recommendation is not binding on the Court.
". . . .
"[JUDGE HARD]: To mitigation. Number one....
". . . .
"[JUDGE HARD]: As I mentioned earlier, ladies and gentlemen, I have carefully read every scrap of paper submitted to me, including the Hillcrest discharge papers, Dr. Rosecran's findings, the pre-sentence report by Mr. Bryant, the letters submitted by the respective families. I have listened, of course, to the trial, first and second stage and, as well in October, comments of counsel, and I have reviewed the entire case, recalling the arguments given at the first and second stage and third stage in October.
"To conclude, I find no mitigating circumstance by way of 13A-5-52."
In Ex parte McWilliams, 640 So.2d 1015 (Ala.1993), this Court directed a new sentencing hearing where the record did not reveal whether the trial judge, in imposing the death sentence on the defendant, had improperly considered certain portions of victim-impact statements that contained the type of information involved in this case. In contrast, the record in this case indicates to this Court that the trial court determined Land's sentence in a manner consistent with the procedure established by §§ 13A-5-47 to -52. The record indicates that the trial court reviewed the letters at issue, both those written by the victim's family and those written by Land's family, out of a respect for the families and for the limited purpose of possibly establishing a mitigating factor under § 13A-5-51 to be weighed in Land's favor at trial. We find no plain error in the actions of the trial court.

V.
Land next argues that his conviction under count one of his indictment must be reversed because, he says, the State failed to introduce sufficient evidence by which a rational jury could conclude that he was guilty on that count. Count one charged Land, pursuant to Ala.Code 1975, § 13A-5-40(a)(4), with the intentional killing of Candace Brown in the course of a first or second degree burglary. Land contends that the State introduced no evidence that he intended to commit a theft when he entered Ms. Brown's home and, thus, he argues that the trial court erred in denying his motion for a judgment of acquittal on that count. Relying on Coulter v. State, 438 So.2d 336 (Ala.Cr.App.1982), judgment affirmed, Ex parte Coulter, 438 So.2d 352 (Ala.1983), denial of habeas corpus affirmed, Coulter v. Herring, 60 F.3d 1499 (11th Cir.Ala.1995), he also argues that no proof of intent to commit a theft was put before the jury, so that the aggravating factor that the murder was committed while the defendant was engaged in a burglary, listed in Ala.Code 1975, § 13A-5-49(4), should not have been used in the determination of his sentence. Land contends that he should receive a new sentencing hearing.
In response, the State argues that it presented evidence that, when Land broke into Ms. Brown's home, he clearly intended to commit a theft therein. The State notes that it presented in evidence Land's statement to the police in which he said that when he met Tony and Edward they discussed "doing a burglary" and in which Land said he told them "he knew an easy mark." In that statement Land said he drove to Ms. Brown's home, broke a window, and entered through that window, planning to commit a theft, but was interrupted by Ms. Brown. The State contends that that evidence was sufficient to support a jury's finding that, when Land broke into Ms. Brown's home, he intended to commit a theft.
In Ex parte G.G., 601 So.2d 890, 892 (Ala.1992), we stated: "In order to defeat a defendant's motion for judgment of acquittal, the State must prove, by substantial evidence, the elements of the charge and the defendant's guilt beyond a reasonable doubt." However, an appellate court will review the evidence in a light most favorable to the prosecution. Breckenridge v. State, 628 *238 So.2d 1012 (Ala.Cr.App.1993). Moreover, a conviction will not be set aside because of an alleged insufficiency of the evidence unless the preponderance of the evidence against the verdict is so decisive as to clearly convince the appellate court that the verdict is unjust. Id.
In this case, given Land's statement to the police regarding his "break-in" into Ms. Brown's house, we conclude that the State presented substantial evidence that Land intended to commit a theft therein. Thus, the trial court did not err in denying Land's motion for a judgment of acquittal on the first count of his indictment. Given that ruling, we need not address Land's second contention, that he should receive a new sentencing hearing.

VI.
Land argues that the "fruits" of his arrest, including his first statement and the evidence obtained from his car, were improperly admitted into evidence. He contends that when the police arrested him, without an arrest warrant, they did not have probable cause to do so. Thus, he argues, the statement and other evidence were "fruit of the poison tree" and admission of the evidence violated his rights guaranteed under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and rights guaranteed under the Alabama Constitution. Land claims that he was "under arrest" when the police took his shoes and clothes and gave him a jail uniform to wear because at that time, he says, he was no longer free to leave the police station.
He asserts that his arrest was made without probable cause because, he says, under the totality of the circumstances there was not a fair probability that he had committed a crime. He contends that all the police knew about the crime at that time was that there had been a burglary at Ms. Brown's house, that she had disappeared, that his name and telephone number had been found on a bulletin board in the house, and that he appeared to have blood spatters on his shoes. Land points out that the police also knew at that time that he had been cooperative with their investigation of Ms. Brown's disappearance, had given a voluntary statement, and had accounted for his whereabouts at the time she had disappeared. Land argues that although the police later obtained additional incriminating evidence against him, that fact does not validate what he says was an illegal arrest. As noted above, Land argues that the fruits of his arrest were not admissible and that his conviction, based on that evidence, should be reversed.
The State agrees that Land was under arrest, though not formally, when the police took his clothes and shoes. However, the State argues that Land's arrest was supported by probable cause, pointing to such evidence as the fact that Land's telephone number was found in Ms. Brown's house, that Land had admitted to cutting the telephone line and breaking into Ms. Brown's house a week before her murder, that his story about having lunch that day with his second girlfriend and leaving his car at her house was not true, that Land was wearing tennis shoes with a "USA" tread design that appeared similar to a shoe print on a piece of glass that had been removed from Ms. Brown's house, and that he appeared to have blood spatters on his shoes.
Ala.Code 1975, § 15-10-3(a)(3), states that a police officer may arrest a person without a warrant "[w]hen a felony has been committed and the officer has reasonable cause to believe that the person arrested committed the felony." An officer has reasonable, or probable, cause to make an arrest "when, at the time the arrest is made, the facts and circumstances within his knowledge, and of which he has reasonably trustworthy information, are sufficient to lead a prudent person to believe that the suspect is committing or has committed an offense." Gord v. State, 475 So.2d 900, 902-03 (Ala.Cr. App.1985). See Manning v. State, 568 So.2d 327 (Ala.Cr.App.1990), and Brannon v. State, 549 So.2d 532 (Ala.Cr.App.1989). Thus, a warrantless arrest is not legal if it is supported only by a suspicion in the officer's mind that the person has committed an offense. Brannon, supra. Evidence seized pursuant to a warrantless arrest not supported by probable cause is inadmissible, and *239 a conviction based on that evidence must be reversed. Id.
Land and the State disagree as to whether the police were aware, when they arrested Land, that the tread design on his tennis shoe was similar to the print on the pane of glass that had been removed from Ms. Brown's house. However, even if the police were unaware of that particular connection of Land to the crime, we conclude that Land's arrest was amply supported by probable cause. The trial court did not err in admitting the evidence seized pursuant to Land's warrantless arrest.

VII.
At oral argument, Land argued to this Court that his cross-examination of Detective Fowler was improperly curtailed when the trial court would not allow him to question Fowler about the contents of an internal police memorandum outlining an anonymous tip that two persons other than Land may have been involved in Ms. Brown's murder. Land contends that the police were overly zealous in their investigation of him and that they failed to conduct a thorough investigation of other potential suspects. He now argues that the memorandum was admissible under the "public records exception" to the hearsay rule, relying on Grantham v. State, 580 So.2d 53 (Ala.Cr.App.1991),[3] and, thus, he asserts that he should have been allowed to further cross-examine Fowler on the question whether there were other possible suspects. Land asserts that the trial court committed reversible error in limiting the scope of his cross-examination of Fowler because, he says, it prevented him from fully developing his defense and infringed upon his right to confront witnesses testifying against him. He contends that the court's action violated his rights guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and rights guaranteed by Alabama law.
Land also argues that the trial court infringed on his right to full cross-examination when, he says, it prohibited defense counsel from asking leading questions of Detective Corvin. He contends that the court's action limiting cross-examination of Corvin violated his rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and rights guaranteed by Alabama law.
In response, the State points out that Land's counsel was allowed, without objection, to ask Fowler whether he had seen the memorandum at issue and that counsel obtained a response indicating that he had seen it. The State notes that Land's counsel then attempted to elicit from Fowler a statement of the contents of the memorandum. It argues that the memorandum was clearly hearsay evidence and inadmissible, and that the trial court therefore did not err in preventing Land from further questioning Fowler regarding the contents of the memorandum.
The Court of Criminal Appeals held that the trial court correctly ruled the internal police memorandum inadmissible hearsay. It stated: "`The general rule in Alabama is that an accused is not entitled to introduce testimony that someone else was suspected of committing the crime for which he is being tried.'" Land, 678 So.2d at 207 (quoting Johnson v. State, 612 So.2d 1288, 1293 (Ala. Cr.App.1992)).
With regard to Land's argument relating to his cross-examination of Detectives Fowler and Corvin, we note that the latitude and extent of cross-examination of witnesses rests within the sound discretion of the trial court and that the trial court's ruling on these matters will not be reversed except for an abuse of discretion. Ex parte Pope, 562 So.2d 131 (Ala.1989), cert. denied, 498 U.S. 841, 111 S.Ct. 118, 112 L.Ed.2d 87 (1990); Beavers v. State, 565 So.2d 688 (Ala. Cr.App.1990). We find no abuse of discretion with regard to the trial court's limitation on Land's cross-examination of Fowler with regard to the police memorandum. The contents of the memorandum were clearly hearsay reduced to a writing. Although Land argues that the memorandum was admissible *240 under a "public records exception" to the hearsay rule, which he says is similar to the business records exception, we conclude that such an exception would not make the document admissible, and admissibility was required in order for Land to be entitled to further question Fowler about the document. Exceptions to the hearsay rule will not make admissible into evidence documents that are inadmissible for reasons other than the fact of their hearsay nature. Gullatt v. State, 409 So.2d 466 (Ala.Cr.App.1981). In this case, the evidentiary rule relating to testimony about other suspects, which the Court of Criminal Appeals relied upon and which is quoted above, made the memorandum inadmissible. The trial court did not abuse its discretion in limiting Land's cross-examination of Detective Fowler.
Similarly, we find no abuse of discretion by the trial court with regard to Land's cross-examination of Detective Corvin. The trial court did sustain a "leading question" objection by the prosecution to a question asked of Corvin by defense counsel. However, we conclude that the one ruling by the trial court now complained of by Land did not prevent his counsel from conducting a thorough and sifting cross-examination of Corvin. The record contains an additional 30 pages of questioning of Corvin by defense counsel following the trial court's ruling that Land now claims abridged his constitutional rights.

VIII.
Land argues that the trial court committed reversible error when it denied defense motions to excuse two prospective jurors for cause. Land argues that prospective Juror P.H. should have been dismissed for cause because, Land says, voir dire questioning revealed that he had significant knowledge about the case and that he had a significant potential for bias against Land arising from a sympathy for Ms. Brown's son. Land argues that prospective Juror W.H. should have been dismissed for cause because, he says, during voir dire W.H. expressed an unequivocal belief that once a person is found guilty of capital murder that person should be put to death and that life without parole should not be considered. Land argues that any later "rehabilitation" of W.H. was a response learned by W.H. after observing other similarly opinionated prospective jurors being struck from the jury panel.
In response, the State argues that prospective Juror P.H. did not need to be struck for cause because he indicated only that he had read the newspaper every day and recalled sketchy facts of the case, but did not know any specifics of it. The State argues that prospective Juror W.H. did not need to be struck for cause during questioning by the trial court because he clearly expressed his opinion that the death sentence was not appropriate in every murder case and that each case should be judged on its own merits. In sum, the State contends that there was no statutory ground on which to strike either of these prospective jurors for cause and that they did not show an absolute bias against Land or a fixed opinion as to his guilt or as to the application of the death penalty.
Even though a prospective juror may initially admit to a potential for bias, the trial court's denial of a motion to strike that person for cause will not be considered error by an appellate court if, upon further questioning, it is ultimately determined that the person can set aside his or her opinions and try the case fairly and impartially, based on the evidence and the law. Knop v. McCain, 561 So.2d 229 (Ala.1989); Siebert v. State, 562 So.2d 586 (Ala.Cr.App.1989), affirmed, 562 So.2d 600 (Ala.), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990); Perryman v. State, 558 So.2d 972 (Ala.Cr. App.1989). Only when a prospective juror's testimony indicates a bias or prejudice so fixed or deep-seated that that person cannot be impartial and objective must a challenge for cause be granted by the trial court. Knop, supra; Siebert, supra; Perryman, supra. Finally, a trial court's ruling on a motion to strike a juror for cause, based on an allegation of juror bias, is entitled to great weight and will not be disturbed on appeal unless it is shown that the court clearly abused its discretion. Forehand v. State, 624 So.2d 688 (Ala.Cr.App.1993); Siebert, supra.
*241 After thoroughly reviewing the record, we conclude that the voir dire testimony of both P.H. and W.H. clearly indicates they could try the case fairly and impartially. Neither prospective juror expressed a deep-seated or fixed bias or prejudice that would have required a strike for cause. Accordingly, the trial court did not err in denying Land's motions.

IX.
Land contends, for the first time, that he was deprived of his rights guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and rights guaranteed by Alabama law, to a reliable sentencing determination when, he says, the trial court ignored what he calls an unrebutted nonstatutory mitigating circumstance. Land argues that this unrebutted nonstatutory mitigating circumstance is shown by information contained in records from the Hillcrest mental facility regarding his treatment there in June 1986. Land stresses five bits of information contained in the reports: (1) that he suffered from a conduct disorder, (2) that he had an unstable home environment, (3) that he had significant impulse control problems, (4) that he had no father figure, and (5) that he had no contact with his natural father. Land argues that the trial court erred by simply holding that this information did not rise to the level of indicating a statutory mitigating circumstance, without considering it to indicate a nonstatutory one.
In response, the State argues that although the law requires that a sentencing authority must not be precluded from considering any mitigating evidence, a trial court is not required to list the evidence it considers in determining the existence or nonexistence of nonstatutory mitigating factors. It notes that in this case the trial court clearly stated in its sentencing order that it did consider Land's records from Hillcrest and, thus, that it must have considered the information Land now emphasizes. The State contends that it was not error for the trial court to consider the Hillcrest records without finding the existence of a nonstatutory mitigating circumstance.
In Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978), the Supreme Court stated that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (Emphasis original, footnote omitted.)
In Haney v. State, 603 So.2d 368, 389 (Ala.Cr.App.1991), affirmed, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993), the Court of Criminal Appeals stated the following with regard to nonstatutory mitigating factors:
"It is not required that the evidence submitted by the accused as a nonstatutory mitigating circumstance be weighed as a mitigating circumstance by the sentencer, in this case, the trial court; although consideration of all mitigating circumstances is required, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer."
(Emphasis added.)
The trial court's sentencing order specifically stated that the court had reviewed the Hillcrest records Land now highlights. In fact, in his order the trial judge quoted a portion of those records summarizing Land's history and his condition on discharge. Although the trial court did not find that any of the circumstances described in the Hillcrest records qualified as statutory mitigating factors, it is clear to this Court that the trial court did consider that information when it determined Land's sentence. Thus, we find no plain error in the trial court's sentencing of Land.

X.
Land also argues that the trial court's refusal to allow the use of a jury questionnaire form or individual voir dire prevented him from selecting a fair and impartial jury and, thus, violated his rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution *242 and rights guaranteed by Alabama law. He contends that the use of a jury questionnaire, or individual voir dire examination of prospective jurors, was required in order for him to be able to conduct an effective voir dire designed to detect bias arising from pretrial publicity, without contaminating the entire venire. Land argues that the group voir dire, in which he says 33 of 56 members of the venire responded by indicating that they had been crime victims, left every prospective member of the jury with a greater sense of vulnerability to crime. Land contends that these discussions created an atmosphere of hostility toward him and destroyed any chance of a fair trial. Land also argues that group voir dire examination had the prejudicial effect of "training" members of the venire on how to answer questions relating to the use of the death penalty, in such a way as to avoid being struck for cause.
In response, the State argues that although the trial court did not permit individual sequestered voir dire examination or the use of a jury questionnaire the record shows that the trial court allowed extensive group voir dire examination on the questions of possible prejudice arising out of pre-trial publicity, as well as questions concerning the prospective jurors' views about the death penalty. The State contends that the trial court took adequate steps to ensure that Land would be judged by a fair and impartial jury and that the failure to use the voir dire examination procedure Land now argues was necessary was not reversible error.
A trial court is vested with great discretion in determining how voir dire examination will be conducted, and that court's decision on how extensive a voir dire examination is required will not be overturned except for an abuse of that discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973); Lane v. State, 644 So.2d 1318 (Ala.Cr. App.1994); Harris v. State, 632 So.2d 503 (Ala.Cr.App.1992), affirmed, 632 So.2d 543 (Ala.1993), affirmed, ___ U.S. ___, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). After reviewing the record, we conclude that the trial court did not abuse its discretion in this regard.

XI.
Land next argues that the trial court miscalculated what Land's age was at the time of Ms. Brown's murder, and that the miscalculation denied him an individualized sentence and thereby violated his rights guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and rights guaranteed by Alabama law. Land states that he was born on May 23, 1969, and was only 22 years old at the time of Ms. Brown's death, on May 18, 1992. He argues that the trial court erroneously concluded that he was only a few days short of his 24th birthday at that time. Land contends that, based on the error, the trial court concluded that Land's age at the time of the crime was not an applicable mitigating circumstance. Relying on Lockett, supra, and its progeny, Land argues that the trial court's reliance on the miscalculation deprived him of the right to that court's consideration of a possible mitigating factor that would have suggested a sentence less than death and, thus, requires reversal of his sentence.
In response, the State notes that Land did not raise this claim at his sentencing or on direct appeal and that, therefore, it is subject to review only under the plain error standard. In sum, the State argues that Land has not shown the degree of harm required for a reversal under the plain error standard. It argues that even if the trial court had not made the miscalculation, which the State considers "minor," it is improbable that it would have made any difference in that court's decision that Land's age at the time of the crime was not a mitigating circumstance.
In its sentencing order, the trial court did miscalculate Land's age at the time of Ms. Brown's murder. The trial court stated that Land was "five days short of his 24th birthday," when he was actually five days short of his 23d birthday. Although Land has attempted to magnify the error by arguing he was only 22 and the trial court determined he was almost 24, the truth is that the trial court miscalculated by only one year. Whether he was five days short of 23, or five days short of 24, Land was clearly an adult, not a minor, when he killed Ms. Brown. We conclude that the trial court's miscalculation *243 of Land's age by one year did not rise to the level of plain error.

XII.
Land also argues that the prosecutor introduced, and that the trial court improperly admitted, evidence of a prior burglary at Ms. Brown home a few days before she was killed. Land argues that the admission of this evidence violated his rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and rights guaranteed by Alabama law. Land says that before his trial a local newspaper reported that Ms. Brown's home had been burglarized, and the phone line cut, a few days before her murder. Land says that the trial court granted his motion in limine to preclude the State from referring to this previous burglary, yet allowed the prosecutor to introduce facts about the burglary through the testimony of Ms. Brown's former landlord. Although Land's argument is not clearly articulated, he contends that it was reversible error for the trial court to overrule his objections and let the jury be told of a prior bad act that he says they would assume he committed.
In response, the State contends that here is no indication in the record that the prosecutor, or any witness called by the State, mentioned Land's involvement in a prior burglary, or mentioned even that a burglary had occurred. The State argues that the prosecutor merely described the sequence of events surrounding the murder, i.e., the res gestae.
As a general rule, when a person is being tried for the alleged commission of one crime, evidence that he or she committed another illegal act that is not now charged is generally inadmissible. McLemore v. State, 562 So.2d 639 (Ala.Cr.App.1989); Gainer v. State, 553 So.2d 673 (Ala.Cr.App.1989); C. Gamble, McElroy's Alabama Evidence § 69.01(1) (4th ed. 1991). An exception to this rule is that that evidence of the other crime is admissible if the other crime is part of the res gestae, or the transactions inseparable from the crime charged. Gainer; McElroy's, § 69.01(3).
Our review of the trial record indicates that there were no comments by the prosecution, and no testimony by a witness, informing the jury that a burglary had occurred at Ms. Brown's home a few days before her murder. The prosecutor did comment in his opening statement that the phone line at the house had been previously cut and then repaired before the night of Ms. Brown's abduction, and Ms. Brown's landlord was allowed to offer testimony to the same fact. However, the statements regarding the phone line did not directly violate the trial judge's order granting Land's motion in limine and directing the State not to mention the earlier burglary. Nor would a reasonable juror naturally assume from such limited statements that a prior burglary had occurred and that Land had committed it. The fact that the phone line had previously been cut and then repaired, shortly before Ms. Brown's abduction and murder, was sufficiently related to the murder to be considered part of the res gestae. We conclude that there was no violation of the general exclusionary rule described above and that the trial court did not err in overruling Land's objections.

XIII.
Land argues that African-Americans were systematically underrepresented in the pool from which his jury was picked and that the systematic underrepresentation prevented his having a jury selected from a fair cross-section of the community and violated his rights guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and rights guaranteed by Alabama law. Land says that in the Birmingham Division of Jefferson County, where his trial was held, African-Americans constitute 42.92% of the total population. He says that only 9 persons on the 56-member jury venire (or 16.07%) were African-Americans. Land argues that this 26.85% underrepresentation of African-Americans on his jury venire requires the reversal of his conviction and death sentence. Citing J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), Land notes that although he is white, he may raise an equal protection issue relating to exclusion of African-Americans *244 from his jury because, he says, the general rule is that a defendant claiming an equal protection violation resulting from the exclusion of a class of persons from a jury need not belong to the class of persons alleged to have been illegally excluded.
Although the State concedes that African-Americans constitute a distinctive group for equal protection purposes, it argues that, even assuming Land's census calculations are correct, he failed to establish that there had been a systematic exclusion of African-Americans from the venire. Citing Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the State argues that Land has failed to establish all the elements needed to prove a violation of the constitutional requirement that a jury be taken from a fair cross-section of the community.
In Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), the United States Supreme Court held that the systematic exclusion of women from the jury selection process deprived the defendant of his rights guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution to have his jury selected from a fair cross-section of the community. Then in Duren, supra, the Court stated:
"In order to establish a prima facie violation of the fair cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a `distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process."
Duren v. Missouri, 439 U.S. at 364, 99 S.Ct. at 668-69. See Ex parte Dobyne, 672 So.2d 1354 (Ala.1995). In Duren, the Supreme Court held that the defendant had met the third prong of the test, the most difficult one: "His undisputed demonstration that a large discrepancy occurred not just occasionally but in every weekly venire for a period of a year manifestly indicates that the cause of the underrepresentation was systematic that is, inherent in the particular jury selection process utilized." Duren v. Missouri, 439 U.S. at 366, 99 S.Ct. at 669. Land, however, has offered no evidence toward meeting the third prong of the test established in Duren. Thus, we conclude that Land's argument on this issue is without merit.

XIV.
Finally, Land argues that the trial court's failure to transcribe certain portions of the trial proceedings requires a reversal of his conviction and sentence because, he says, it prevented him from obtaining a full review of critical portions of his trial. Land says that the trial record reveals over 20 instances in which no transcription was made during what he says were important portions of his trial. According to Land, these portions of the trial include selection of the jury venire; striking the jury; conferences regarding the admissibility of testimony or exhibits offered by the State; a conference that occurred just before Land waived his right to testify; a conference on jury instructions; and the polling of the jury at both phases of the trial.
Land contends he was prejudiced by the lack of a complete transcription. He first argues that it prevented him from challenging the trial court's methods used for selecting a venire and for striking the jury. Land contends that numerous objections he made to the admission of prosecution testimony or exhibits were not preserved. Finally, he argues that the failure to transcribe a conference that occurred just before he waived his right to testify prevented him from challenging that waiver as involuntary or unknowing.
In response, the State argues that there are only two ways Land could show that he was legally entitled to have transcriptions made of the portions of the trial that were not transcribed: (1) by showing that he filed, and that the court granted, a pretrial motion for a transcription of the entire proceedings, or (2) by showing that those portions of the trial not transcribed came within the requirements of Rule 19.4(a), Ala.R.Crim.P.. The State says that Land did not move to have all portions of the proceedings transcribed, and it argues that none of the portions not transcribed *245 falls within the requirements of Rule 19.4(a). The State further argues that Land's claim of prejudice is unpersuasive because, it says, he has failed to show any untranscribed trial incident as to which he could prove reversible error if he had a transcription of the incident.
We conclude that there is no merit to Land's claim of reversible error based on the lack of a complete transcript of his entire trial proceedings. In Hammond v. State, 665 So.2d 970, 972 (Ala.Crim.App.1995), the Court of Criminal Appeals stated that with regard to such a claim as Land now makes, the reviewing court "must determine whether a substantial right of the appellant has been adversely affected by [the] omission from the transcript." Further, this Court has ruled that even where a transcript was lacking for a portion of the trial that should have been transcribed and the defendant's appellate counsel had not been the defendant's trial counsel, the appellate court had to examine the existing record of the trial in order to determine whether the failure to transcribe that portion of the trial was only harmless error rather than reversible error. Ex parte Harris, 632 So.2d 543 (Ala.1993) (holding that although the failure to transcribe the voir dire examination of the jury was error, it was only harmless error, even when the trial court had granted the defendant's motion to have all proceedings in all phases of the trial transcribed), affirmed, ___ U.S. ___, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995).
The portions of the trial that Land says were not transcribed involve selection of the jury venire and striking the jury; bench conferences among the trial judge, the prosecution, and defense counsel; or the polling of the jury. Regarding transcription of a capital murder trial, such as Land's, Rule 19.4(a), Ala.R.Crim.P.,[4] states:
"In all capital cases (criminal trials in which the defendant is charged with a death penalty offense), the court reporter shall take full stenographic notes of voir dire of the jury and of the arguments of counsel, whether or not such is ordered by the judge or requested by the prosecution or defense. This duty may not be abrogated by the judge or waived by the defendant."
(Emphasis added.)
In Ex parte Harris, this Court noted that the phrase "arguments of counsel," as it is used in Rule 19.4(a), does not refer to "every incidental discussion between counsel and the trial judge that occurs at the bench," but, rather, refers only to counsel's opening and closing arguments. 632 So.2d at 545. Thus, it is clear that Rule 19.4(a) did not require the court reporter to transcribe the various bench conferences now placed in issue by Land. Although Land claims error in the lack of a transcript of the court's selection of the venire and of the actual striking of the jury, Rule 19.4(a) requires only transcription of the "voir dire of the venire," which was transcribed in full and which is part of the record in this case. Nor does Rule 19.4(a) require transcription of the polling of the jury. The transcript shows that both following the jury foreman's pronouncement of the jury's finding as to guilt and then later following the foreman's pronouncement of the jury's recommended sentence, the court reporter made a contemporaneous notation indicating that the judge polled the jury.
It is important to note that Land did not request that all proceedings of the trial be transcribed and, as explained above, Rule 19.4(a) did not require that they all be transcribed. Thus, Land cannot argue that the trial court breached a legal duty with regard to the transcription of his trial. Moreover, Land is raising this issue for the first time on appeal, and our review is subject to the plain error standard. After reviewing the record at the point of each transcript omission referenced by Land, we conclude that the lack of a complete transcription has not adversely affected his substantial rights. Thus, we find no plain error.

*246 XV.
As noted above, we have reviewed the record and the briefs, we have considered the arguments made before us on oral argument, and we have examined the opinion of the Court of Criminal Appeals in relation to the issues raised before that court. We have also thoroughly reviewed the record for plain error, but have found none. We conclude that the Court of Criminal Appeals did not err in affirming Land's conviction and sentence. Moreover, we find that the record contains overwhelming evidence indicating Land's guilt. The judgment of the Court of Criminal Appeals affirming Land's conviction and death sentence is affirmed.
AFFIRMED.
HOOPER, C.J., and MADDOX, HOUSTON, KENNEDY,[*] INGRAM, and COOK, JJ., concur.

On Application For Rehearing
BUTTS, Justice.
Land has raised a new argument on application for rehearing. Land, a white male, argues that the State used its peremptory challenges to strike white veniremembers, and particularly white men, in a racially discriminatory and gender-discriminatory manner, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). Land did not raise this argument in the trial court, before the Court of Criminal Appeals, or before this Court on its original review. Further, we did not find such a violation on our review of the record for plain error.
As noted previously, Land has also argued that he should receive a new trial because, he says, African-Americans were systematically underrepresented in the venire and, thus, his jury was not chosen from a fair cross-section of the community. The jury pool for Land's trial was composed of 9 African-Americans and 47 white persons. However, we held that Land did not meet the test set out in Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), for proving such a Constitutional violation (see part XIII of the March 1, 1996, opinion). Now, in what he has said was a jury pool that overrepresented the white population, Land argues that he was prejudiced by the State's using its peremptory challenges to strike white persons from the venire. Specifically, Land argues discrimination by the State's using 11 of its 14 peremptory challenges against white members of the venire, and 7 of the 14 against white men. However, we also note that the record reveals that Land himself used all 14 of his peremptory challenges to strike white persons, and used 7 of the 14 against white men.
The record shows that Land did not object to the State's use of its peremptory strikes. Accordingly, no hearing was held in the trial court pursuant to the procedure set out in Ex parte Branch, 526 So.2d 609 (Ala. 1987). Land now argues that he has made out a prima facie case of intentional racial and gender discrimination, and that his case must be remanded to the trial court for an evidentiary hearing to allow the State to present race-neutral and gender-neutral reasons for its strikes. We conclude, however, on review of the record, that Land has not made a prima facie showing that the State used its peremptory strikes in violation of Batson or J.E.B. Accordingly, we find no error in the State's use of its peremptory challenges.
APPLICATION OVERRULED.
HOOPER, C.J., and MADDOX, SHORES, HOUSTON, KENNEDY, INGRAM, and COOK, JJ., concur.
NOTES
[1] The parties agree that Land was arrested at this point.
[2] We further note that the lack of a contemporaneous objection by experienced defense counsel leads this Court to believe that the prosecutor's comment was not stated with an inflection or tone that would have naturally led a listener to construe it as a reference to Land's failure to testify.
[3] In Grantham, the Court of Criminal Appeals stated: "Sections 12-21-35 and 36-18-2 [Ala. Code 1975] essentially establish a public record exception to the hearsay rule that is similar in nature to the business record exception found in § 12-21-43." 580 So.2d at 55.
[4] This rule creates duties for the court reporter in addition to those established by Ala.Code 1975, § 12-17-275.
[*] Justice Kennedy did not sit at oral argument of this case; however, he has listened to the tape of that oral argument.